[L. A. No. 16673.   In Bank.—May 5, 1939.]

S. A. SKINNER et al., Respondents, v. JOHN P. COY et al., Appellants.

Jerome B. Kavanaugh, District Attorney, Albert E. Weller, Chief Deputy District Attorney, and Stanley Mussell for Appellants.

U. S. Webb, Attorney-General, Earl Warren, Attorney-General, and Bayard Rhone, Deputy Attorney-General, as *Amici Curiae*, on Behalf of Appellants.

Fred A. Wilson and Martin J. Coughlin for Respondents.

Meserve, Mumper & Hughes and Hewlings Mumper, as *Amici Curiae*, on Behalf of Respondents.

THE COURT.—After further study of the record in this case, we are of the opinion that the District Court of Appeal arrived at the correct conclusion in its opinion filed in this action, and written by Judge Charles C. Haines of the Superior Court in and for the County of San Diego while sitting as a member of the District Court of Appeal, Fourth District. We have adopted in part the opinion of the District Court and have followed the same by certain conclusions of our own. That portion of said opinion which we have adopted, reads as follows:

"This action was brought by respondents, S. A. Skinner and Gem Rounds Skinner, to obtain an injunction forbidding appellant, John P. Coy, who is the agricultural commissioner of San Bernardino county, from entering upon a peach orchard within that county owned by respondents and removing and destroying peach trees which, according to respondents' claim were and are producing marketable crops. The complaint alleges that appellant, prior to November 21, 1936, informed respondents of his intention to enter upon their premises for that purpose; that on the date mentioned he did enter thereon for that purpose, and only desisted therefrom temporarily when threatened by respondents with bodily injury, and still threatens to return and uproot and remove peach trees from the premises, whereby respondents' property will be made unproductive and practically value-

less.   In the answer appellant admits that he threatened to enter and did on November 21, 1936, enter upon respondents' premises, but that such entry was for the purpose of uprooting and removing certain diseased peach trees therefrom; that he only desisted from so doing because of respondents' threats of bodily injury if he persisted; but that the only peach trees that he threatened or attempted to remove were trees infected with the disease known as 'peach mosaic'.   He admits that it is his intention, unless restrained by the court, to return and remove such trees.   By way of a separate defense appellant in his answer sets up his status as agricultural commissioner of the county and that he was and is a duly appointed, qualified and acting state plant quarantine officer and an enforcing officer of all laws, rules and regulations related to the prevention of the introduction into or spread within the state of pests, all under the supervision of the director of the department of agriculture of the state of California.   He alleges further than on or about October 9, 1936, in his capacity as such agricultural commissioner he received information from the department of agriculture of the state of California of the existence of the fruit disease known as 'peach mosaic' in certain of the peach orchards in San Bernardino county; that, pursuant to the authority vested in him by the Agricultural Code of the state, and accompanied by duly qualified plant pathologists of the department of agriculture of the state of California, he entered upon respondents' premises for the purpose of making an inspection to determine whether or not such 'peach mosaic' existed thereon and proceeded with said pathologists personally to examine the peach trees there growing and then and there determined that certain of the said peach trees were affected by such 'peach mosaic'.   He further sets up that said 'peach mosaic' is a transmissible and infectious disease; that the Yucaipa valley, wherein respondents' premises are located is planted to many thousands of peach trees, many of which are healthy and in bearing but many others whereof are affected by said 'peach mosaic'.   He further avers that it has been determined by the departments of agriculture of the United States and of the state of California that said 'peach mosaic' is a virus disease existing in the sap of fruit trees; that its presence ultimately destroys the productivity of the trees; that it spreads to other trees in the same orchard and to adjoining orchards; that

it will not respond to exterior treatment such as fumigation or sprays; that the scientists of the said departments have reached the conclusion which appellant alleges to be the fact that the only effective method of control is the extermination of infected trees by uprooting and burning the same. It is further alleged that in pursuance of his duties appellant on the 24th day of October, 1936, caused to be personally served on respondents a notice, a copy of which is attached to the answer, requiring respondents to eradicate, destroy or control the said 'peach mosaic' within ten days after service upon them of the notice, all of which they refused and neglected to do, in consequence of which, on or about November 21, 1936, appellant attempted to enter upon their premises to destroy said diseased peach trees pursuant to law, but was forcibly prevented from so doing, and threatened by respondents with bodily injury if he persisted in so doing. Appellant further alleges that unless the diseased peach trees on respondents' premises are eradicated and destroyed said 'peach mosaic' will spread to other peach trees in the vicinity of respondents' premises and infect a large number thereof and that the eradication and destruction of respondents' diseased trees is necessary to the preservation of the peach orchards and peach industry of San Bernardino county. An injunction was therefore sought on behalf of appellant restraining respondents from interfering with his enforcement of the Agricultural Code of the state by so destroying and eradicating the disease aforesaid from respondents' premises. A copy of the notice referred to, served upon respondents in attempted compliance with section 129 of the Agricultural Code, is directed to respondents, describes their premises, sets out that the same were inspected on the 21st and 22d days of October, 1936, and determined to be infected with 'peach mosaic' disease and proceeds to notify them that there are thereon peach trees infected with such disease, which the notice states was declared by law to be a public nuisance. The notice then proceeds as follows:

" 'You are hereby required to eradicate, destroy or control the said peach mosaic disease to the satisfaction of the said Agricultural Commissioner within ten days after the service on you of this notice by removing the infected trees with sufficient roots that no shoots will develop therefrom, and burning the brush.'

"The notice concludes with information that if respondents neglect or refuse to comply with its requirements appellant will cause the nuisance to be abated and that the expense thereof will become a lien upon respondents' premises.

"The evidence shows that in the year 1931 there appeared in Texas the so-called 'peach mosaic', which is a virus disease affecting peach trees. This disease has since been identified in Colorado, Utah, New Mexico, Arizona, and in the counties of Riverside and San Bernardino in California. According to testimony given by Dr. Lee M. Hutchins, a plant pathologist of the United States department of agriculture, who states that for some years he has devoted himself chiefly to the study of this disease, as well as by one Gilbert L. Stout and one M. R. Harris, plant pathologists of the California state department of agriculture, and various other pathologists and inspectors attached to the latter department, the symptoms of the disease are, among others, breaking in the flowers, both in shape and color patterns, retarded foliation in the spring with a tendency to crinkling and mosaic-like discolorations and yellow mottling of the leaves, stunting of growth by the shortening of the internodes, the tufting of foliage at the terminals of growing shoots, and bumpiness and general malformation of the fruit, including an abnormally deepened crease on the suture side of the peach, and an abnormally prominent apex. The disease, according to these experts, differs in the details of its behavior with the different varieties of peach trees and most conspicuously affects the freestone peaches such as Elbertas, but is by no means confined to them; and its tendency is to reduce the size, destroy the symmetry and general appearance of the peach and to make the crops unmarketable. No single one of the symptoms referred to is deemed sufficient for identification of the disease, but reliance is placed on the picture presented by the appearance of various symptoms, some of which may be absent in certain varieties of peach trees. Dr. Hutchin's testimony is that the disease, like other virus diseases, both in the vegetable and animal kingdoms is deep-seated in the tissues; that in the case of peach trees it cannot be reached by exterior applications and that there is no known means of eradicating it otherwise than by the uprooting and destruction of the trees affected by it. His testimony is further to the effect that the disease is, as respects any given tree, slow acting and does not kill the tree, but that it is infectious and that

the vector of the infection is thus far unknown, so that it is impossible to say at what particular time of the year the infection occurs. It has, however, according to him, been demonstrated that the infection is not transmitted in the seed nor yet carried in the soil. The effect of Mr. Stout's testimony is that, in areas affected, the increase among infected trees has been largely above 100 per cent per annum, proceeding, of course, by geometrical progression, so that if it is uncontrolled the orchard will in the course of a few years become completely diseased. According to appellant's witnesses some 16 peach trees on respondents' property were in 1936 definitely determined to be infected with 'peach mosaic' and under appellant's supervision marked as being so infected. After such marking the notice already referred to was given.

"Plaintiff and respondent S. A. Skinner, and various other orchardists, testified on behalf of respondents. It was not denied that some of the trees were infected with a malady constituting a virus disease. It was not denied that most, at least, of the 16 trees marked by the inspectors in 1936 had various of the symptoms described by appellant's experts as present in cases of 'peach mosaic'. Indeed, Skinner, when asked whether he was not unable to state whether or not certain of these trees had the infection of 'peach mosaic' frankly said: 'As far as I know they do have. It seems to correspond to the description that has been given of "peach mosaic".' Skinner says that the fruit of only five of the 16 marked trees was unmarketable. He conceded that all or practically all of these 16 trees had, to some extent mosaic marked leaves, but claimed that several of them had, under intensive conditions of fertilization and general care, shown marked improvement in condition. A number of them, however, were old trees past their prime. After the initial trial of the case the court postponed its disposition during the cropping season of 1937 for the purpose of permitting observation to be had of the behavior of the orchard during that season. There is testimony in the record that during the season of 1937, 25 additional trees showed signs of infection. There is also testimony on the part of appellant's witnesses that the general increase in infection in the Yucaipa district between 1936 and 1937 had been approximately 170 per cent.

"The court filed findings of fact and conclusions of law which are attacked in various particulars as self contradictory as well as unsupported by the evidence. It was found to be true that appellant was, at the times mentioned, and is agricultural commissioner of San Bernardino county and as such, in October, 1936, was advised by the state department of agriculture of a report that 'peach mosaic' existed in certain peach orchards in San Bernardino county; that in his capacity as such commissioner, and accompanied by duly qualified plant pathologists, he entered upon respondents' property to determine the existence of the disease in the peach trees there growing and personally examined respondents' peach trees with said plant pathologists, and, upon such examination, determined that some of the same were affected by a virus disease which he and said plant pathologists believed to be 'peach mosaic'. The court further went on to find that 'peach mosaic' is a transmissible and infectious disease, that the Yucaipa valley and territory in the immediate vicinity of respondents' real property is planted to many thousands of peach trees, many of which are healthy and bearing, but some of which are infected with a virus disease; that it has been determined by the departments of agriculture of the United States and of the state that 'peach mosaic' is a virus disease existing in the sap of fruit trees, of such character as ultimately to destroy their productivity; that it spreads to other trees in the same and adjoining orchards, and that the scientists of said departments have reached the conclusion that it can only be eradicated by uprooting and burning the infected trees. The court went on to find that 'pursuant to the duties imposed upon him' appellant personally served on the respondents on October 24, 1936, the notice to which reference has already been made, and that copy of the same was recorded in the office of the county recorder of San Bernardino county and that the respondents have failed and neglected to eradicate the virus disease with which some of their peach trees are infected; that appellant, in his capacity as agricultural commissioner of said county, accompanied by deputy agricultural commissioners of the county, attempted on November 21, 1936, to enter upon respondents' property to eradicate the virus disease there existing, then believed by them to be 'peach mosaic', and to destroy the peach trees affected thereby, from which action they were deterred by force and threats of

violence on the part of respondents. The court, however, found to be untrue the allegations of paragraph 10 of the second defense contained in the answer, which paragraph is to the effect that:

" 'That unless the diseased peach trees on plaintiffs' premises are eradicated and destroyed the disease with which said trees are affected, to-wit: Peach Mosaic, will spread to other peach trees in the vicinity of plaintiffs' premises and will infect a large number of peach orchards in the area adjacent to plaintiffs' real property. That the eradication and destruction of said diseased trees is necessary to the preservation of the peach orchards and the peach industry in the County of San Bernardino.'

"The court concluded as a matter of law that appellant had no right or authority to enter upon said real property for the purpose of destroying any of the peach trees growing thereon; that appellant had not given notice to respondents as required by section 129 of the Agricultural Code; that the 16 peach trees affected with the virus disease claimed by appellant to be 'peach mosaic' constituted 'neglected plants' within the meaning of section 141 of the Agricultural Code; that it was necessary that appellant be perpetually enjoined from entering upon respondents' real property and uprooting and removing the 16 trees affected by said virus disease or other trees or plants growing or that might thereafter be planted upon said real property. Judgment awarding such injunction was thereupon entered, from which the present appeal follows.

"Evidently the theory of the trial court was that it was entitled, in a proceeding in equity, to investigate and determine the question whether the trees involved were or were not affected with 'peach mosaic', or merely with some other virus disease not susceptible of dangerous results. Its conclusion apparently was that this particular orchard was not infected with 'peach mosaic' but merely with some other relatively innocuous virus disease and its action was a result of that conclusion. It is conceded by respondents that trees growing upon private property affected with a virus disease may constitute a public nuisance. (Civ. Code, secs. 3479, 3480.) It is also conceded that a public nuisance may be summarily abated by 'an officer authorized thereto by law'. (Civ. Code, sec. 3494.) It is, however, claimed that sections 129 to 138, both inclusive, of the Agricultural Code do not

authorize appellant to summarily destroy trees conceived by him to be infected by disease. Counsel undertake to draw a distinction between 'pests' which the commissioner may require the owner to eradicate, destroy or control, and trees which are the victims of such pests; and this, notwithstanding that section 135 of the same code declares that 'premises, plants, conveyances or things infected or infested with pests or premises where pests are found' constitute public nuisances and may be prosecuted as such. It is observed that where the notice to the owner to eradicate, control or destroy the pests is disregarded the commissioner may, under the provisions of section 136 of the Agricultural Code, proceed to abate the nuisance by eradicating, controlling or destroying the 'pests'. A tenuous distinction is attempted between his power to eradicate the disease and his power to eradicate the trees which harbor the disease. The distinction is obviously fallacious. It seems entirely clear to us that where a tree or plant has become to such an extent infected by a disease that the disease cannot be eradicated without the destruction of the plant, and such disease is one which, if not eradicated, threatens other plant life in the neighborhood, the tree or plant harboring the disease is in itself a pest and subject to abatement as such. Furthermore, under subdivision (a) of section 100 of the Agricultural Code defining a 'pest', it may consist not only in any infectious, transmissible or contagious disease of plants, 'liable to be dangerous or detrimental to the agricultural industry of the state', but of any form of vegetable life liable to be so dangerous or detrimental, from which it must follow that when any form of vegetable life is the host of any infectious, transmissible or contagious disease liable to be so dangerous or detrimental it also is a 'pest' and must remain such, unless it is possible to eradicate from it the disease in such infectious, transmissible or contagious form.

A further claim on the part of respondents is that, if the trees which appellant has sought to destroy can be said to constitute public nuisances at all, the exclusive method of abating them is that provided by sections 141 et seq. of the Agricultural Code. The first paragraph of section 141 is to the effect that:

" 'Neglected or abandoned plants or crops which, because of the existence therein or thereon of pests, or because of other conditions, constitute a menace to the agriculture of the

county, district, or vicinity, or which are host plants of or provide a favorable and likely harbor for pests are public nuisances and it is unlawful to maintain the same, and all remedies which are or may be given for the prevention or abatement of nuisances apply thereto.'

''Subsequent provisions of this section and of sections 142, 143 and 144 provide machinery in the nature of a special proceeding in the superior court whereby a judicial ascertainment of the necessity of the 'removal or destruction of the neglected or abandoned plants or crops' may be had and the owner be required to remove or destroy the same. Section 145 provides for their removal or destruction by the commissioner in the event of failure by the owner to comply with the court's order. Further provisions contained in sections 146 and 147 provide for the establishment and foreclosure as against the property affected of a lien for the costs incurred, and section 148 makes it contempt to disobey the court's order in the matter.

''We think it clear that there is nothing in sections 141 to 148, both inclusive, of the Agricultural Code above outlined, to militate against the lawfulness of appellant's attempted conduct here involved. It is highly questionable whether the court's conclusion of law that the peach trees on respondents' premises found to be infected with a virus disease 'constitute neglected plants within the meaning of section 141 of the Agricultural Code' is right. The evidence tends to show that instead of neglecting them respondents have given them special attention and fertilization. The machinery for judicial investigation and action provided for in sections 141 et seq. is not by their terms made applicable to all plants or crops wherein or whereon pests exist, or which are host plants of, or provide favorable and likely harbor for pests, but only to such plants or crops wherein and whereon pests exist or which are such host plants or provide a favorable and likely harbor for pests as are also *neglected* or *abandoned*. What we have in the instant case are trees that are being given a high degree of care but are nevertheless infected. Even if it be conceded, however, that these trees can be properly described as 'neglected' or 'abandoned' plants within the meaning of said section 141 it does not follow that the method of procuring their removal provided by said sections 141 to 148, both inclusive, is the exclusive

method permitted. On the contrary, by the express terms of section 141 'all remedies which are or may be given for the prevention or abatement of nuisances apply thereto'; and under section 3494 of the Civil Code 'a public nuisance may be abated by any public body or officer authorized thereto by law'. We think that a tree or other plant infected with a communicable disease or diseases amounting to a pest or pests, even if it be conceded to fall within the definition of a 'neglected' or 'abandoned' plant, is not only a nuisance but a nuisance of the description specified in section 135 of the Agricultural Code and subject thereunder to abatement by the commissioner under section 136 of that code 'by eradicating, controlling or destroying such pests' and when the only practical method of eradicating, controlling or destroying the pests is to destroy the plant, the power to destroy the pests necessarily includes the power to destroy the plant.

"Respecting provisions for the summary abatement of agricultural nuisances, it is in 1 Ruling Case Law, 790, said:

" 'The efficiency of regulations of this type necessarily depends upon their prompt and summary execution, and it is, therefore, unavoidable that a certain amount of discretion must devolve upon the administrative officers entrusted with their enforcement, as before they act they must necessarily decide whether a thing possesses the qualities constituting it a nuisance under the statute or not. While in a strict sense this discretion is judicial in its nature, it does not constitute a delegation of "judicial powers" within the meaning of the usual constitutional inhibition against the delegation of judicial powers to an administrative officer. Consequently, statutes providing for the summary destruction of vegetation infected with contagious pests, without any preliminary judicial inquiry and without compensating the owner for the resulting loss, are perfectly constitutional so long as they themselves define what constitutes a nuisance, and there is a right to a subsequent judicial review of the action of the administrative officer. As property thus destroyed is confiscated under the police power of the state, the owner thereof is not entitled to be compensated as a matter of right.'

"Various aspects of such regulations have frequently been before the courts both of this and of other jurisdictions. Statutes frequently provide for the summary abatement of agricultural nuisances by executive officers and the establishment and foreclosure of liens upon the property affected to

defray the cost involved. Often such statutes define in a general way what shall constitute a nuisance but leave it in the first instance to the determination of the enforcing officer to decide in a particular case whether such a nuisance has come to exist. A familiar example is the legislation providing for the control of ground squirrels. Of this it is said in *Contra Costa County* v. *Cowell Portland Co.*, 126 Cal. App. 267, 271, et seq. [14 Pac. (2d) 606] :

" 'The police power is universally considered "to justify the destruction or abatement . . . of whatever may be regarded as a public nuisance. . . . " (*Lawton* v. *Steele*, 152 U. S. 133 [38 L. Ed. 385, 14 Sup. Ct. 499, 500].) . . . "every property owner . . . is also bound so to use and enjoy his own as not to interfere with the general welfare of the community in which he lives. It is the enforcement of this . . . duty which pertains to the police power of the state so far as the exercise of that power affects private property. Whatever restraints the legislature imposes upon the use and enjoyment of property within the reason and principle of this duty, the owner must submit to, and for any inconvenience or loss which he sustains thereby he is without remedy. It is a regulation and not a taking, an exercise of police power and not of eminent domain.'' (1 Lewis on Eminent Domain, 3d ed., sec. 6.) '

"The court then proceeds to quote the portion of the paragraph from Ruling Case Law above set out.

"The Supreme Court in the case of *Los Angeles County* v. *Spencer*, 126 Cal. 670 [59 Pac. 202, 77 Am. St. Rep. 217], had before it a statute providing for a county horticultural commission, authorizing it to abate insect pests in citrus orchards and providing for liens against the property involved for the expense. The action was to foreclose such a lien and the statute was attacked as unconstitutional. The court said :

" 'It is urged that the act in question is unconstitutional and invalid because it confers judicial powers upon the horticultural commissioners, contrary to article III of the state Constitution; but we do not think that this contention can be maintained. This provision of the Constitution must be understood as construed by judicial decisions, and with reference to the subject of police power. The act itself defines the nuisances to which it relates and declares that ''all places, orchards, nurseries'', et cetera, infected with ''scale insects, or codlin moth, or other pests injurious to fruit, plants'',

et cetera, are public nuisances. In determining whether any particular place is a nuisance, the commissioner, no doubt, exercises some discretion which, in a strict sense, is in its nature judicial; but the executing of a police regulation quite often calls into action that kind of discretion. And yet the acts of a commissioner involved in this case are no more judicial than the acts of officers under many other laws and ordinances which have been held valid. Ordinances prohibiting the erection of wooden buildings within fire limits except upon the order of fire commissioners; giving viticultural commissioners power to prohibit the importation of diseased vines; prohibiting the carrying on of a public laundry without a certificate of the health officer and of the board of fire wardens; prohibiting retail liquor business without permission of the board of police commissioners; giving to the superintendent of public streets the power to determine where, either on a public street or on private premises, any rubbish should be deposited; forbidding orations, harangues, et cetera, in a park without consent of the park commissioners, or upon other grounds except by permission of the city government committee; beating drums, et cetera, without permission of the president of the village; prohibiting manufacturers and others from ringing bells, et cetera, except at such times as the board of aldermen may designate; authorizing harbor masters to station vessels and to assign each its place; forbidding the keeping of swine without a permit from the board of health; and giving to boards of health, quarantine officers, and milk inspectors discretion as to the exercise of police powers—all such laws and ordinances have been judicially held to be valid, although they confer the same power upon designated public officers as is given by the act here in question to the commissioners. (*Ex parte Ah Fook,* 49 Cal. 402; *In re Flaherty,* 105 Cal. 558 [38 Pac. 981, 27 L. R. A. 529], and cases there cited; *Ex parte Fiske,* 72 Cal. 125 [13 Pac. 310]; *Bittenhaus* v. *Johnston,* 92 Wis. 588 [66 N. W. 805, 32 L. R. A. 380]; *Train* v. *Boston Disinfecting Co.,* 144 Mass. 523 [11 N. E. 929, 59 Am. Rep. 113]; *Newton* v. *Joyce,* 166 Mass. 83 [44 N. E. 116, 55 Am. Rep. 385].) The efficiency of many police regulations depends upon their prompt and summary execution; and therefore, from necessity, certain discretion must be given to the officers who are to make the regulations effective. In *Ex parte Ah Fook, supra,* this court said: ''It is obvious that to render effectual an inquiry which has for its purpose the

carrying into operation of quarantine or health laws it must be prompt and summary, and we are not aware that any reasonable provisions of the statute clothing such officers or boards with enlarged powers often exercised by them, have ever been held unconstitutional." . . .

" 'It is known that the existence of the fruit industry in . the state depends upon the suppression and destruction of the pests mentioned in the statute. The act in question is, therefore, a proper exercise of the police power which the legislature has, under section 1 of article XIX of the Constitution, to subject private property to such reasonable restraints and burdens as will secure and maintain the general welfare and prosperity of the state.'

"The particular statute involved in *County of Los Angeles* v. *Spencer,* contained no authority to destroy the affected trees, as the destruction of the particular pests there provided against did not necessitate such destruction. The same principles have, however, been often applied where the more or less summary destruction of property is involved, notably in legislation now also embodied in the Agricultural Code for the eradication of bovine tuberculosis. Such legislation is regularly upheld. (*Coelho* v. *Truckell,* 9 Cal. App. (2d) 47 [48 Pac. (2d) 697]; *Stanislaus County Dairymen's Protective Association* v. *County of Stanislaus,* 8 Cal. (2d) 378 [65 Pac. (2d) 1305]; *Loftis et al.* v. *Superior Court,* 25 Cal. App. (2d) 346 [77 Pac. (2d) 491].) It is to be observed that this legislation provides for the destruction of animals 'reacting positively to a tuberculin test conducted by a representative of the Federal or State Department of Agriculture or adjudged tuberculous upon physical examination by said representative' (Agricultural Code, secs. 236, 237), without any provision for any hearing for the owner as to whether or not such animals are in fact diseased. There are, indeed, certain provisions for compensation when the slaughtering of diseased stock is done by state officials and the animals are found within control areas established by the state, but it is held that when, outside of such state control areas, counties have, under the authorization of the statute established 'voluntary control areas' and enacted control ordinances providing for no compensation for animals destroyed, reactors may nevertheless, under the supervision of county inspectors thereunto authorized by ordinance, be slaughtered without

payment of compensation. (*Stanislaus County Dairymen's Protective Association* v. *County of Stanislaus, supra.*)

"In *Graham* v. *Kingwell*, 218 Cal. 658 [24 Pac. (2d) 488], the Supreme Court sustained the constitutionality of the California Apiary Inspection Act (Stats. 1927, p. 1724, as amended, now part of the Agricultural Code). It was there said, p. 660:

" 'The act does no violence to the fourteenth amendment to the federal constitution, for it is elementary that where the exercise of the police power is applicable, the provision of the Constitution declaring that property shall not be taken without due process of law is inapplicable. (*Ex parte Elam*, 6 Cal. App. 233, 237 [91 Pac. 811].)'

"Under this statute, as under those provisions of the Agricultural Code involved in the instant case, notice is first given to the owner of the infected condition of his property and he is given a limited time in which to abate the nuisance, and in the event of his failure to do so, its abatement by the officer giving the notice is provided for.

"Cases from other jurisdictions illustrative of the right of properly constituted public authorities summarily to destroy property deemed likely to spread disease are: *Miller* v. *Schoene*, (Va.) 276 U. S. 272 [48 Sup. Ct. 246, 72 L. Ed. 568]; *Carstens* v. *DeSellem*, 82 Wash. 643 [144 Pac. 934]; *State* v. *Main*, 69 Conn. 123 [37 Atl. 80, 61 Am. St. Rep. 30, 36 L. R. A. 623]; *Shafford* v. *Brown*, 49 Wash. 307 [95 Pac. 270]; *Colville* v. *Fox*, 51 Mont. 72 [149 Pac. 496, L. R. A. 1915F, 894]; *Louisiana State Board of Agriculture* v. *Tanzmann*, 140 La. 756 [73 So. 854, Ann. Cas. 1917E, 217, L. R. A. 1917C, 894]; *Kelleher* v. *French*, (Va.) 22 Fed. (2d) 341; *Wallace* v. *Dohner*, 89 Ind. App. 416 [165 N. E. 552]; *Miller* v. *Horton*, 152 Mass. 540 [26 N. E. 100, 23 Am. St. Rep. 850, 10 L. R. A. 116]; *Pearson* v. *Zehr*, 138 Ill. 48 [29 N. E. 854, 32 Am. St. Rep. 113]; *Lemon* v. *Rumsey*, 108 W. Va. 242 [150 S. E. 725]; *Upton* v. *Felton*, 4 Fed. Supp. 585.

█ "It cannot, of course, be doubted that in the exercise of such powers public officers are bound to follow such statutory provisions as may exist regulating the manner in which they shall be exercised and that a failure to do so will render the action taken unlawful. (*County of San Benito* v. *Wapple*, 188 Cal. 423 [205 Pac. 673].) █ Respondents in the instant case claim that appellant failed to follow the procedure prerequisite under section 129 of the Agricultural

Code to any right on his part to proceed to eradicate the disease on their premises, in that the notice that he caused to be served failed to identify the particular 16 trees which he asserts to have been infected. The court's conclusion of law evidently adopted this view, because, despite the finding that the notice made an exhibit of the complaint was served, the court has concluded that the notice required by section 129 was not given. The notice, however, informs respondents that their premises, which are there properly described, have been 'found and determined to be infected with peach mosaic disease' and that there are there 'peach trees infected with peach mosaic disease', and proceeds to declare such infected trees a public nuisance and to require respondents within ten days to eradicate, destroy or control the said 'peach mosaic' disease by 'removing the infected trees with sufficient roots that no shoots will develop therefrom, and burning the brush'. The evidence shows that certain WPA workers, after an instruction from the experts of a week or thereabouts, with respect to the symptoms of the disease to be looked for, went through respondents' orchard and charted fifteen trees, to which a sixteenth was later added, as having the symptoms of the mosaic. These charts were furnished to appellant and the department pathologists followed up the WPA men and verified the presence of the symptoms and, according to their opinion, the existence in these trees of the 'peach mosaic', and thereupon proceeded to mark the trees with white paint. Respondents now claim that they were not advised by the notice and do not even know from the evidence that the trees so marked are those found by appellant to be infected. Respondent, S. A. Skinner, not only knew that appellant was having a search made to locate infected trees but he testified at length to his observation of the marked trees with the particular view of testing the diagnosis, and says himself that these trees showed the symptoms described in the evidence as indicative of the disease. As respects the notice, it is, under section 129 of the Agricultural Code, to be given to the 'record owner or person in charge of said premises, plants, conveyances or things, that the same are infected or infested with said pest', etc. We think that under the statute a correct description of the premises as infected, with a specification of the existence of the infection in trees thereon is, in general, enough, without an attempt in the notice to designate every particular

tree or plant in which the infection exists. It might be that in a property of very extensive area more particularity would be reasonably necessary. The statute, however, must be given a reasonable construction and in the circumstances here shown the notice given was in our opinion sufficient.''

In the performance of the duties of his office as prescribed by the Agricultural Code, it was the duty of appellant as Agricultural Commissioner of said county, under the circumstances set forth herein, to eradicate the pests infecting the trees upon respondents' premises, and as it was necessary to destroy said trees in order to eradicate said pests, the appellant was clothed with statutory authority to destroy said diseased trees. No injunction will, therefore, lie against appellant in the discharge of these official duties imposed upon him by statute.

The judgment is reversed.