[No. H000211. Sixth Dist. Dec. 10, 1985.]

FARMERS INSURANCE EXCHANGE et al.,
Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

**COUNSEL**

William T. Mayo for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, James R. Schwartz and Susan R. Oie, Deputy Attorneys General, for Defendants and Respondents.

**OPINION**

**BRAUER, J.**—This action arises out of the Mediterranean fruit fly eradication program. The chemical mixture employed by the state in its wide-scale aerial spraying caused erosion of the painted surface of automobiles. Plaintiffs/appellants are five insurance companies which were obliged to pay numerous claims of their policy holders for costs of new paint jobs. By this action they seek recompense from the state.

Plaintiffs' second amended complaint stated eight causes of action. Three defendants—the state, the State Controller Kenneth Cory, and Jerry Scrib-

ner, the project manager of the medfly eradication program—filed general demurrers. By order dated November 23, 1983, these were sustained without leave to amend as to seven causes of action. The eighth cause of action was voluntarily dismissed without prejudice.

Plaintiffs appeal from the November 23 order. ■ Initially we note that an order sustaining a demurrer is not appealable. (*Munoz* v. *Davis* (1983) 141 Cal.App.3d 420, 431 [190 Cal.Rptr. 400].) No judgment of dismissal appears in the record. The matter has been fully briefed, however, and dismissal of the appeal at this stage due to a technical defect would serve no purpose. Therefore, in the interests of justice, we will deem the trial court's order to incorporate a judgment of dismissal and treat plaintiffs' notice of appeal as applying to the judgment. (*California State Employees' Assn.* v. *State of California* (1973) 32 Cal.App.3d 103, 106 [108 Cal.Rptr. 60].) For reasons discussed below we affirm the trial court's order as to the first six causes of action and order that plaintiffs be granted leave to amend their seventh cause of action.

## I

### INTRODUCTION

We briefly review the statutory background of the medfly eradication program.

Food and Agricultural Code sections 5321 et seq. provide the Director of the Department of Food and Agriculture the authority to establish those regulations which, in his discretion, are necessary to prevent the spread of any pest in the state.[1] Pursuant to this statutory authority on June 27, 1980, the director filed regulation 3591.5 of title 3 of the California Administrative Code. This regulation designated specific eradication areas and set forth various means and methods which might be employed in the eradication program, including "the use of insecticides, chemicals, or other materials as spray, dust, bait, or in any other manner as often as necessary to effect control." (Cal. Admin. Code, tit. 3, § 3591.5, subd. (c)(1).) In addition, regulation 3591.5 provided that all those areas of the state where the medfly

---

[1]Food and Agricultural Code section 5321 states: "If the director receives information of the existence of any pest which is not generally distributed within this state, he shall thoroughly investigate the existence and probability of its spread, and the feasibility of its control or eradication."

Food and Agricultural Code section 5322 states: "The director may establish, maintain, and enforce quarantine and such other regulations as are in his or her opinion necessary to circumscribe and exterminate or prevent the spread of any pest which is described in Section 5321."

was known to exist were subject to the provisions of article 4, chapter 8, part 1, division 4 of the Agricultural Code (§ 5761 et seq.). Section 5762 states that any "premises, plants and things" exposed to infestation within the eradication area are public nuisances and subject to all relevant laws relating to the prevention and abatement of public nuisances.[2]

As the infestation proved to be beyond the control of the personnel and equipment of the affected counties, the Governor on December 24, 1980, declared a state of emergency pursuant to the Emergency Services Act (Gov. Code, § 8625 et seq.), and directed that state facilities and personnel be utilized. Government Code section 8627 provides: "During a state of emergency the Governor shall, to the extent he deems necessary, have complete authority over all agencies of the state government and the right to exercise within the area designated all police power vested in the state by the Constitution and laws of the State of California in order to effectuate the purposes of this chapter. In exercise thereof, he shall promulgate, issue, and enforce such orders and regulations as he deems necessary, in accordance with the provisions of Section 8567."[3] The Governor's proclamation directed all agencies of the state government to employ state personnel, equipment and facilities to alleviate the emergency. Thereafter wide-scale

---

[2]Food and Agricultural Code section 5762 states: "Any pest with respect to which an eradication area has been proclaimed, and any states of the pest, its hosts and carriers, and any premises, plants, and things infested or infected or exposed to infestation or infection with such pest or its hosts or carriers, within such area, are public nuisances, which are subject to all laws and remedies which relate to the prevention and abatement of public nuisances."

[3]Text of the Emergency Services Act, Government Code section 8567 reads as follows: "(a) The Governor may make, amend, and rescind orders and regulations necessary to carry out the provisions of this chapter. Such orders and regulations shall have the force and effect of law. Due consideration shall be given to the plans of the federal government in preparing such orders and regulations. The Governor shall cause widespread publicity and notice to be given to all such orders and regulations, or amendments or rescissions thereof. [¶] (b) Orders and regulations, or amendments or rescissions thereof, issued during a state of war emergency or state of emergency shall be in writing and shall take effect immediately upon their issuance. Whenever the state of war emergency or state of emergency has been terminated, such orders and regulations shall be of no further force or effect. [¶] (c) All orders and regulations relating to the use of funds pursuant to Article 16 (commencing with Section 8645) of this chapter shall be prepared in advance of any commitment or expenditure of such funds. Other orders and regulations needed to carry out the provisions of this chapter shall, whenever practicable, be prepared in advance of state of war emergency or state of emergency. [¶] (d) All orders and regulations made in advance of a state of war emergency or state of emergency shall be in writing, shall be exempt from the provisions of Chapter 4.5 (commencing with Section 11371), Part 1, Division 3, Title 2, of the Government Code,[*] but shall be subject to the approval of the Emergency Council. As soon thereafter as possible they shall be filed in the office of the Secretary of State and with the county clerk of each county."

*Repealed; see, now, § 11340 et seq.

aerial spraying with the insecticide malathion was undertaken until eradication of the medfly was declared in September of 1982.

## II

### DISCUSSION

■ Since the case comes to us after a demurrer was sustained in the lower court, review is limited to the question of the sufficiency of plaintiffs' pleadings. We take up each cause of action in order as set forth in plaintiffs' second amended complaint.

### 1. *First Cause of Action. Inverse Condemnation*

It is not disputed that the state's actions in launching and carrying out the eradication program were taken pursuant to statutory authority. It is also not in dispute that such actions were in response to a statewide emergency of potentially huge proportion.

■ Plaintiffs' claim, that the incidental damage to automobile paint caused by the spraying must be fully compensated, is based on article I, section 19 of the California Constitution. This article provides in part that "[p]rivate property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." There is, however, a well-known exception to the general rule stated in the Constitution. Damages inflicted in the course of a proper exercise of the state's police power are noncompensable. (*Holtz v. Superior Court* (1970) 3 Cal.3d 296, 305 [90 Cal.Rptr. 345, 475 P.2d 441].) " '[T]he constitutional guarantee of just compensation attached to an exercise of the power of eminent domain does not extend to the state's exercise of its police power, and damage resulting from a proper exercise of the police power is simply *damnum absque injuria*' [citations]." (*Freeman v. Contra Costa County Water Dist.* (1971) 18 Cal.App.3d 404, 408 [95 Cal.Rptr. 852].) A government's action will be upheld as a valid exercise of police power if it is "reasonably necessary to 'protect the order, safety, health, morals, and general welfare of society.' [Citations.]" (*Ibid.*)

The point is made that it is a question of fact whether the exercise of the police power is reasonable or proper under the circumstances, a matter which therefore cannot be resolved at the pleading stage. This may be so in those cases where it is unclear whether the public agency is exercising a regulatory police power or an eminent domain power constituting a taking. (*Associated Home Builders, etc. Inc. v. City of Walnut Creek* (1971) 4

Cal.3d 633, 638 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847]; *Morshead* v. *California Regional Water Quality Control Bd.* (1975) 45 Cal.App.3d 442, 450 [119 Cal.Rptr. 586].) Where there exists an obvious emergent public interest, however, such analysis is unnecessary. "In such cases calling for immediate action the emergency constitutes full justification for the measures taken to control the menacing condition, and private interests must be held wholly subservient to the right of the state to proceed in such manner as it deems appropriate for the protection of the public health or safety." (*House* v. *L. A. County Flood Control Dist.* (1944) 25 Cal.2d 384, 391 [153 P.2d 950].) Among the types of emergencies which justify police action without calling for compensation are "the demolition of all or parts of buildings to prevent the spread of conflagration, or the destruction of diseased animals, of rotten fruit, or infected trees where life or health is jeopardized." (*Ibid.*)

In our view there is no question but that the case at bar falls squarely within the police power exception to the just compensation rule stated in California Constitution article I, section 19. Thus the state and its agents are afforded complete immunity from liability on this theory.

■ Plaintiffs next contend that Government Code sections 8572 and 8652 of the Emergency Services Act provide a statutory basis for their inverse condemnation claim. These sections provide that the state pay the reasonable value of property *commandeered* or *utilized* during a state of emergency. The emphasized language describes a "taking" of private property for public use. As discussed above, the medfly eradication program was a valid exercise of the state's police power to abate a public nuisance. Damage to automobile paint incidental to the exercise of this power does not rise to the level of a "taking" and is thus noncompensable. (*Skinner* v. *Coy* (1939) 13 Cal.2d 407, 421 [90 P.2d 296].)

■ Finally, plaintiffs make the argument that any immunity the state might have by virtue of the police power or the immunity provision of the Emergency Services Act (discussed in section 4 herein) has been affirmatively waived by the passage of Assembly Bill No. 3383, effective June 30, 1982. This bill established a "Medfly Claims Fund" and appropriated $4 million to it. Section I of the bill states that this claims fund is to be "the exclusive source of funding for payment of all legitimate costs, claims, judgments or other liabilities arising from the Mediterranean fruit fly infestation." Compensation for damage to automobiles is limited to $689 or 20 percent of the value of the car, whichever is less. We do not find it inconsistent that the state assert its right to exercise its police power without incurring unlimited liability for damage caused thereby, and still provide a

limited fund for partial reimbursement to those so damaged. Establishing such a fund therefore does not amount to a waiver of governmental immunity.

■ The state's police power, exercised in an emergency to protect the public interest, provides a cloak of absolute immunity from liability under both article I, section 19 of the Constitution and Government Code sections 8572 and 8652. The demurrer to plaintiffs' first cause of action for inverse condemnation was therefore properly sustained.

■ 2. *Second Cause of Action. Trespass to Chattels and Nuisance*

Necessity is a complete defense to these torts. "A defendant who acts to prevent a threatened injury from some force of nature, or some other independent cause not connected with the plaintiff, is said to be acting under necessity. . . . [¶] . . . Where the danger affects the entire community, or so many people that the public interest is involved, that interest serves as a complete justification to the defendant who acts to avert the peril to all . . . ." (Prosser and Keeton, Torts (5th ed. 1984) pp. 145-146.)

■ Moreover, acts done pursuant to express statutory authority are by definition not a nuisance. Section 3482 of the Civil Code reads: "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." Plaintiffs' argument here is that the governor's proclamation pursuant to the Emergency Services Act did not "expressly authorize" the state to damage automobile paint finishes. This misses the point. The authorizing statute need not predict the precise nature of the damages. It need only authorize the governmental action.

■ Plaintiffs cite *Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285 [142 Cal.Rptr. 429, 572 P.2d 43] in support of their position. That case concerned a sewage treatment plant which was emitting noxious odors affecting plaintiffs' property. Plaintiffs proceeded on a nuisance theory, inter alia. City claimed immunity under Civil Code section 3482. The court held that section 3482 did not shield city from liability in that the statutes authorizing city to construct sewage treatment plants could not reasonably have been construed to authorize the emission of septic smells onto plaintiffs' land. The *Varjabedian* case is readily distinguishable from ours. In our case the nuisance complained of, the release of a chemically destructive spray into the atmosphere, was precisely what was authorized by the various statutes outlined in section I. Civil Code section 3482 is therefore fully exculpatory. The state and its agents are thus immune from liability under both Civil Code section 3482 and general tort principles and plaintiffs' second cause of action must fail.

### 3. *Third Cause of Action. Strict Liability*

Plaintiffs' third cause of action is predicated on section 862, subdivision (b) of the Government Code: "[¶] (b) A public entity is liable for injuries caused by its use of a pesticide to the same extent as a private person except that no presumption of negligence arises from the failure of a public entity or public employee to comply with a provision of a statute or regulation relating to the use of a pesticide if the statute or regulation by its terms is made inapplicable to the public entity or the public employee."

At the outset, it is by no means clear that this statute does impose strict liability on the state. The Law Revision Commission note states: "Although it appears that the effect of the California statutes and regulations relating to the use of pesticides is to impose 'strict' liability for injuries resulting from such use, this conclusion will remain uncertain until there has been a judicial determination of the question in California." Research reveals no case to date interpreting this code section.

The Attorney General argues that section 862, subdivision (b) simply does not apply to the facts of this case. He reasons that the statute plainly appears to govern those situations where the state is carrying out proprietary activities on property it either owns or controls as a private person would do. Thus it would not apply in a situation where the state is acting in its governmental capacity to abate a statewide nuisance.

We tend to agree with this interpretation of the statute. In any case, the state and its agents would be immune from liability under section 862, subdivision (b) by virtue of the immunity provision of the Emergency Services Act (Gov. Code, § 8655) more fully discussed in the following section. Thus plaintiffs' third cause of action must fail.

### 4. *Fourth Cause of Action. Negligence*

Plaintiffs allege that the state and its employees were negligent and careless in the formulation and spraying of the malathion mixture in that they knew or should have known that the mixture so prepared and sprayed over populated areas would cause widespread damage to the paint on motor vehicles. Accepting these facts as true for purposes of the demurrer, the state contends that it is nonetheless absolutely immune from liability for its actions under the immunity provision of the Emergency Services Act. (Gov. Code, § 8655.) This section provides: "The state or its political subdivi-

sions shall not be liable for any claim based upon the exercise or performance, or the failure to exercise or perform, a discretionary function or duty on the part of a state or local agency or any employee of the state or its political subdivisions in carrying out the provisions of this chapter."

It is clear that the Governor's proclamation under express authority of Government Code section 8625, and the subsequent spraying of malathion were policy level decisions. This would be true as well with respect to the myriad decisions regarding the implementation of the program, such as the length of spraying, size of droplets, type of mixture, area to spray, etc. Since plaintiffs' claim is based directly upon these acts, section 8655 applies to provide the state with immunity from liability. The purpose of the statute is obvious. In those cases where the state must take the steps necessary to quell an emergency, it must be able to act with speed and confidence without fear of incurring tort liability. (See e.g., *Martin* v. *Municipal Court* (1983) 148 Cal.App.3d 693, 696 [196 Cal.Rptr. 218].)

Plaintiffs take the position that the spraying of malathion was ministerial rather than discretionary conduct. A ministerial act takes place on the purely operational level rather than the policy making or planning level. (*Nunn* v. *State of California* (1984) 35 Cal.3d 616 [200 Cal.Rptr. 440, 677 P.2d 846].) We have no difficulty concluding as a matter of law that the acts complained of in plaintiffs' fourth cause of action were an exercise or performance (i.e., carrying out) of a discretionary function on the part of the state. Thus the state has absolute immunity from liability for negligence under Government Code section 8655.

5. *Fifth Cause of Action. Tortious Interference With Contractual Relations*

A central headquarters for the medfly program was established in Los Gatos, under the direction of defendant/respondent Jerry Scribner. In addition to coordinating the operation of the spraying program itself, the headquarters also received inquiries, complaints and demands for restitution by those people who had incurred property damage in the course of the spray program. Plaintiffs allege that Scribner and the other employees systematically, deliberately and maliciously directed all such citizen claimants to their respective insurance carriers, and further that Scribner and others represented that claims would be processed more rapidly and fully in this way than if they were filed with the state. Plaintiffs assert that this constituted a tortious interference with the contractual relations between plaintiffs and their insureds.

Plaintiffs cannot state a cause of action for tortious interference with contract on these facts. The insurance companies were under a contractual obligation to pay covered claims of their policy holders. The acts of Scribner and others in suggesting that the policy holders proceed to enforce their contracts does not amount to "interference" with contractual relations. The elements of this tort include: 1) The existence of a valid contract; 2) knowledge of the contract on the part of defendant and intent to induce its breach; 3) breach of the contract by the third party; 4) proximate cause; 5) damages. (*H & M Associates* v. *City of El Centro* (1980) 109 Cal.App.3d 399 [167 Cal.Rptr. 392].) There was no breach here, and no intent on the part of the state employees to induce a breach.

This cause of action must also fail.

### 6. *Sixth Cause of Action. Denial of Civil Rights*

Plaintiffs' sixth cause of action is based upon the same set of facts as the preceding cause. It is claimed that the actions of Scribner and others in referring citizen claimants to their respective insurance companies constituted a denial of plaintiffs' rights of due process of law and equal protection under the federal Constitution, thus stating a claim under 42 United States Code, section 1983.[4]

For the same reasons that the circumstances presented here do not constitute an actionable tort, they do not amount to a violation of any civil rights. The demurrer was properly sustained.

### 7. *Seventh Cause of Action. Writ of Mandate*

Plaintiffs' seventh cause of action is against Kenneth Cory, the State Controller, and rests upon the following allegations. Effective June 30, 1982, a "Medfly Claims Fund" was established by the Legislature and funded with approximately $4 million. (Stats. 1982, ch. 332, p. 1634.) On August 30, 1982, plaintiffs, as subrogees of their policy holders, presented some 3,500 claims to the State Controller. Plaintiffs appear to be making the argument

---

[4] 42 United States Code section 1983 reads in pertinent part. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

that their claims are not being considered while claims of other individual citizens are being processed and paid. But exhibits to their complaint demonstrate that some claims of their subrogors have in fact been approved by the State Board of Control. Plaintiffs next claim that they were informed by the state on or about July 27, 1983, that no further approval letters would be issued. It is not alleged however whether this policy was to apply only to claims submitted by plaintiffs or to all claims alike. ██ ██ ██ ██ Plaintiffs' prayer seeks a writ of mandate ordering Controller Cory to audit, approve, authorize and direct payment of their claims.[5]

██ Chapter 1, part 5, of the Government Code "Payment of Claims and Judgments against the State" provides that claims which have been approved by the State Board of Control and for which there exists sufficient appropriation, shall be paid by the state upon presentation of documents discharging the state of liability. (Gov. Code, § 965.) Section 965.7, subdivision (a) provides that "[a] writ of mandate is an appropriate remedy to compel the state, or an officer or employee of the state, to perform any act required by this chapter."

To the extent that plaintiffs have approval letters, and have submitted the required discharge documents, they are entitled under these Government Code sections to payment from the state if monies are available in the claims fund.

Moreover plaintiffs have a right, under principles of equal protection, to have their claims processed by the board in like manner to those claims submitted by other citizens.

If there is a reasonable possibility that a complaint can be amended to state a cause of action, it is an abuse of discretion to sustain a demurrer without leave to amend. (*Cordonier* v. *Central Shopping Plaza Associates* (1978) 82 Cal.App.3d 991, 999 [147 Cal.Rptr. 558].) Although plaintiffs have failed to set forth a cause of action under Government Code section 965 or on equal protection grounds, the pleading reveals possible bases for recovery under either of these theories. We therefore find that the court abused its discretion in sustaining a demurrer to this cause of action without leave to amend.

---

[5] In conjunction with their seventh cause of action, plaintiffs also seek recovery under the Pest Control Compact. (Food & Agr. Code, §§ 8801-8808.) Nothing in these statutes, however, creates a cause of action for damages occurring as a result of eradication efforts.

We affirm the trial court's order as to plaintiffs' causes of action one through six and direct that plaintiffs be allowed to amend their seventh cause of action. Each party to bear its costs on appeal.

Panelli, P. J., and Agliano, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 19, 1986. Panelli, J., did not participate therein. Bird, C. J., was of the opinion that the petition should be granted.