[No. B085106. Second Dist., Div. Three. Nov. 26, 1996.]

DOMINGO DOMINIC ADKINS et al., Plaintiffs and Appellants, v. THE STATE OF CALIFORNIA et al., Defendants and Respondents.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portions deleted are parts IV and VI.

## COUNSEL

Lyden & Graziano and Christine C. Lyden for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Charles Getz IV, Assistant Attorney General, Randall B. Christison, Deputy Attorney General, for Defendants and Respondents.

## OPINION

**ALDRICH, J.**—This case comes to us after the trial court granted a nonsuit in favor of defendant and respondent State of California (the State) at the conclusion of plaintiffs' opening statement. The court entered judgment finding the State was immune from liability under the Emergency Services

Act. The primary issue we address is whether the State is immune from liability under the Emergency Services Act for intentionally lying to persons about the health and safety of chemicals they handled during a state emergency to eradicate an infestation of pests. We conclude in such situations the State is not immune from intentional concealment of known dangers which cause personal injuries. We therefore reverse the judgment.

## INTRODUCTION

This case arises out of the Mediterranean fruit fly (Medfly) eradication program of 1989. Plaintiffs and appellants (plaintiffs) were hired by the State to hang Medfly traps by the State. Plaintiffs became ill after handling the chemical used in the traps. Plaintiffs' supervisors knowingly lied to plaintiffs about the effect of the chemical, told plaintiffs the chemical was completely safe and refused to allow plaintiffs to wear protective clothing. As a result of exposure to the chemical, plaintiffs incurred physical injuries. The trial court granted the State's motion for nonsuit after plaintiffs' opening statement.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A. Facts[1]

In 1989 the Medfly struck Southern California, leading the Governor to declare a state of emergency aimed at stopping the infestation. (*Macias* v. *State of California* (1995) 10 Cal.4th 844, 848 [42 Cal.Rptr.2d 592, 897 P.2d 530].) The Governor declared an emergency on August 9, 1989.[2]

Plaintiffs Domingo Dominic Adkins, Dante Anthony Adkins, Dreco L. Adkins, Andre Jerome Adkins and Fernando Terence Snow, collectively referred to as plaintiffs, were hired as Medfly trappers by the California State Department of Food and Agriculture as part of the Medfly project.[3] Plaintiffs worked at the Elysian Park facility. Neil Wright and Marcella Zita supervised plaintiffs.

In 1981 Wright was trained by the State to use the chemical Trimedlure. Wright had used Trimedlure for eight years. Wright had a bachelor's degree

---

[1]Since this matter comes to us upon the granting of a motion for nonsuit, we accept as true the statements made in the opening statement. (Code Civ. Proc., § 581c.)

[2]We have taken judicial notice of this fact as an act of the executive branch. (Evid. Code, § 452, subd. (c).) Governors of this state have declared similar emergencies three times over the last twenty-six years. (*Macias* v. *State of California, supra,* 10 Cal.4th at p. 847.)

[3]Domingo Dominic Adkins, Dante Anthony Adkins and Dreco L. Adkins were employed on November 30, 1989. Andre Adkins was employed in December 1989 and Fernando Terence Snow was employed in January 1990.

in entomology, the study of insects. Although plaintiffs were high school graduates, they did not have backgrounds in science or entomology. Plaintiffs looked up to and trusted Wright.

Plaintiffs primarily handled Jackson traps. These traps included a basket into which a plug of Trimedlure was placed. When placed into the basket, the plug was in solid form; when opened and exposed to the air, the plug crystallized. The plug was intended to lure Medflies into the trap.

Plaintiffs were first exposed to Trimedlure when employed as Medfly trappers. Plaintiffs baited the traps at the Elysian Park facility, loaded a large number of traps onto vehicles and then put the traps in trees. Since the traps were baited before being placed in the vehicles, plaintiffs breathed escaping fumes as they drove to the various locations.

Packets of Trimedlure have writing on the front and back which read: " 'The toxicological properties of this composition have not been studied. Use with appropriate caution. . . . Refer to the material safety sheets.' " Wright had material safety sheets; however, at no time did he or anyone else from the State provide them to plaintiffs.

Plaintiffs were not given any protective clothing. Plaintiffs asked if they could wear gloves. Wright told them gloves were not necessary and wearing protective clothing might alarm the public. Plaintiffs offered to buy gloves with their own money, but Wright told plaintiffs they could not wear them. Wright also told plaintiffs they would be fired if they wore any type of protective clothing.

Trimedlure is absorbed rapidly though the skin and by breathing. The longer the exposure, the worse the symptoms. Plaintiffs began to feel ill from the first day of employment. They experienced fatigue, nausea, muscle cramps, breathing problems and stomach cramps. Plaintiffs repeatedly asked Wright and Zita if Trimedlure or any other substances they were handling could be making them ill. Plaintiffs were told constantly Trimedlure was completely safe and could not make them ill. Although they continued to feel ill, plaintiffs continued to work, doing a good job. Plaintiffs' symptoms became worse, developing into rashes and the loss of hair. Due to the exposure, all plaintiffs developed neuropathy.[4] All of plaintiffs' symptoms were the result of toxic exposure.

Wright knew plaintiffs' symptoms could have been caused by exposure to Trimedlure. Wright intentionally withheld this information from plaintiffs. Further, Wright advised Zita not to provide any information to plaintiffs.

---

[4] "Neuropathy" is "any of various abnormal states of the nervous system or nerves [especially] when involving degenerative changes. . . ." (Webster's New Internat. Dict. (3d ed. 1993) p. 1521.)

While baiting a trap in February 1990, one of the Adkins plaintiffs rubbed his eye with his hand while holding a crystal; the chemicals from the crystal got into his eye severely burning it. Three days after this incident, one of the Adkins brothers was fired. Wright stated the termination was due to falsifying records, but this statement was untrue. The firing was actually because Wright was upset with the eye accident and because of plaintiffs' repeated complaints about Trimedlure.[5]

Domingo Adkins went to the news media and discussed plaintiffs' concerns about Trimedlure. When Wright learned of the contact with the media, Domingo Adkins was fired. A few weeks later, the other plaintiffs were fired. By the end of March 1990, plaintiffs were no longer working for the State.

### B. *Procedure*

Plaintiffs filed charges with the California Department of Fair Employment and Housing and governmental claims with the State. Both were rejected.

Plaintiffs Domingo Dominic Adkins, Dante Anthony Adkins, Dreco L. Adkins and Andre Jerome Adkins filed a civil suit alleging causes of action for wrongful termination, employment discrimination based on physical handicap, defamation, violation of Labor Code section 1050, intentional infliction of emotional distress and fraudulent concealment. In the same lawsuit, plaintiff Fernando Terence Snow alleged causes of action for intentional infliction of emotional distress and fraudulent concealment.

Named as defendants in the civil complaint, and appearing as respondents on appeal, are the State of California, the California Department of Food and Agriculture, Neil Wright and Marcella Zita, collectively referred to as the State.

After plaintiffs' opening statement, the State brought a motion for nonsuit. The State asserted plaintiffs' causes of action were barred for a number of reasons, including immunity of a public entity under the Emergency Services Act, Government Code section 8655.[6] The trial court granted the State's motion for nonsuit ruling plaintiffs' claims were barred by the immunity contained in the Emergency Services Act.

---

[5]The record is unclear as to which Adkins brother suffered injury to his eye and which brother was fired.

[6]The State also argued in its motion for nonsuit plaintiffs' causes of action were barred because: (1) the exclusive remedy for plaintiffs' causes of action was workers' compensation, (2) the complaint did not reflect allegations made in plaintiffs' governmental claims, (3) the

## II.

### STANDARD OF REVIEW

■ "The standard of review for a nonsuit after [the] conclusion of the opening statement is well settled. Both the trial court in its initial decision and the appellate court on review of that decision must accept all facts asserted in the opening statement as true and must indulge every legitimate inference which may be drawn from those facts. [Citations.] A nonsuit at this early stage of the proceedings is disfavored. [Citation.] It can only be upheld on appeal if, after accepting all the asserted facts as true and indulging every legitimate inference in favor of plaintiff, it can be said those facts and inferences lead inexorably to the conclusion plaintiff cannot establish an essential element of its cause of action or has inadvertently established uncontrovertible proof of an affirmative defense. [Citations.]" (*Abeyta* v. *Superior Court* (1993) 17 Cal.App.4th 1037, 1041 [21 Cal.Rptr.2d 680]; accord, *Di Palma* v. *Seldman* (1994) 27 Cal.App.4th 1499, 1505-1506 [33 Cal.Rptr.2d 219].) On appeal from an order granting a nonsuit, we consider the grounds specified by the moving party in support of the motion, unless there is an incurable defect. (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656]; *Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 92-94 [147 P.2d 604].)[7]

The nonsuit here was granted solely on the grounds the Emergency Services Act provides the State with an immunity. We reverse that conclusion (pt. III).[8] We also conclude, in part V, plaintiffs may not go forward with their cause of action for discrimination based upon physical handicap.

---

absence of contractual employment theories for public employees and (4) governmental immunity under the Government Tort Claims Act.

[7]In *Wallace* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1385 [16 Cal.Rptr.2d 113], at page 1395, we failed to enunciate clearly the standard for reviewing a nonsuit after the opening statement, as it was not the focus of our analysis and not the basis for our decision. To the extent, *Wallace, supra,* might be interpreted as establishing a standard of review based upon the grounds relied upon by the trial court, we hold it to be an incorrect statement of the law.

[8]In the unpublished portion of this opinion (pt. IV), we conclude plaintiffs may not go forward with their causes of action for defamation and violation of Labor Code section 1050. We have addressed these specific causes of action because these issues are resolved as a matter of law. In the other unpublished portion of this opinion (pt. VI), we have discussed the fraudulent concealment exception to workers' compensation exclusivity as we believe it will be helpful to the parties upon remand. However, we have not addressed a myriad of issues which require factual determinations. We also have not addressed plaintiffs' cause of action for wrongful termination. In order to evaluate that cause of action, it would be necessary to discuss whether or not the purported misconduct by the State violated a public policy, an issue not addressed by the parties.

## III.

### THE EMERGENCY SERVICES ACT

#### A. *Statutory Scheme and the Medfly Emergency*

"The Mediterranean fruitfly (the 'Medfly') is a pest not native to California . . . . The pest poses a severe threat to the economy and welfare of the Sate of California and can infest over 200 varieties of fruit." (*Talevich v. Voss* (C.D.Cal. 1990) 734 F.Supp. 425, 427.) The incidents giving rise to this case occurred after the Governor, acting pursuant to his extraordinary powers under the California Emergency Services Act (Gov. Code, § 8550 et seq.), declared a state of emergency due to ". . . conditions of extreme peril to the agricultural industry and the safety of agricultural properties . . . caused by the discovery of an infestation of the Mediterranean Fruit Fly . . . ." (Executive Dept., State of Cal., Proclamation of State of Emergency, Aug. 9, 1989, signed by Gov. George Deukmejian.)

Pursuant to a state's police powers, it may enact legislation aimed at protecting the life and health of its citizenry. The State's sovereign powers permit it to promote the order, safety, health, morals and general welfare of society. (*McKay Jewelers, Inc.* v. *Bowron* (1942) 19 Cal.2d 595, 600 [122 P.2d 543, 139 A.L.R. 1188]; *People* v. *H & H Properties* (1984) 154 Cal.App.3d 894, 900 [201 Cal.Rptr. 687].) Police powers are rooted in the law of necessity. Thus, in an emergency, the scope of permissible regulation may increase. (E.g., *Macias* v. *State of California, supra,* 10 Cal.4th at p. 854; *Martin* v. *Municipal Court* (1983) 148 Cal.App.3d 693, 698 [196 Cal.Rptr. 218].)

In prior cases courts have concluded the California Emergency Services Act was a valid exercise of the State's police powers. (*Farmers Ins. Exchange* v. *State of California* (1985) 175 Cal.App.3d 494, 501-502 [221 Cal.Rptr. 225]; *Macias* v. *State of California, supra,* 10 Cal.4th at pp. 853-856.) "The California Emergency Services Act recognizes and responds to a fundamental role of government to provide broad state services in the event of emergencies resulting from conditions of disaster or of extreme peril to life, property, and the resources of the state. Its purpose is to protect and preserve health, safety, life, and property. ([Gov. Code,] § 8550 et seq.) A state of emergency may be proclaimed by the Governor under the conditions proscribed for any area affected ([Gov. Code,] § 8625). The act confers broad powers on the Governor to deal with emergencies." (*Martin* v. *Municipal Court, supra,* 148 Cal.App.3d at p. 696.) "[T]he Emergency Services Act makes clear that in situations of 'extreme peril' to the public welfare the

State may exercise its sovereign authority to the fullest extent possible consistent with individual rights and liberties." (*Macias* v. *State of California, supra,* at p. 854.)[9] "[T]here is no question that the State, in prosecuting the Medfly eradication program, was acting pursuant to its authority under the Emergency Services Act to safeguard the property and security of its citizens." (*Id.* at pp. 856-857.)

As part of an eradication program, the State is obligated by the Food and Agricultural Code to comply with strict notification requirements expressly designed for such programs. (Food & Agr. Code, §§ 5029, 5771 et seq.)[10] "Under Food and Agricultural Code section 5029, the State Department of Food and Agriculture is required to 'design and implement a program to provide information to persons who reside in areas scheduled to be treated with pesticides, on an emergency basis in order to eradicate plant pests.' (Food & Agr. Code, § 5029, subd. (a).) As provided by statute, the purpose of the program 'is to provide information about the health effects of the pesticides used in eradication projects. The program shall be designed to provide the greatest amount of information practicable to affected citizens.

[9]Government Code section 8550 reads in part: "The state has long recognized its responsibility to mitigate the effects of natural, manmade, or war-caused emergencies which result in conditions of disaster or in extreme peril to life, property, and the resources of the state, and generally to protect the health and safety and preserve the lives and property of the people of the state. To insure that preparations within the state will be adequate to deal with such emergencies, it is hereby found and declared to be necessary: [¶] (a) To confer upon the Governor . . . of this state the emergency powers provided herein. . . . [¶] (b) To provide for a state agency to be known and referred to as the Office of Emergency Services, within the Governor's office; . . . [¶] (c) To provide for the assignment of functions to state agencies to be performed during an emergency and for the coordination and direction of the emergency actions of such agencies . . . ."

Government Code section 8558 establishes three degrees of emergencies, "State of war emergency," "State of emergency" and "Local emergency." " 'State of emergency' means the duly proclaimed existence of conditions of disaster or of extreme peril to the safety of persons and property within the state caused by such conditions as . . . plant or animal infestation or disease . . . which conditions, by reason of their magnitude, are or are likely to be beyond the control of the services, personnel, equipment, and facilities of any single county, city and county, or city and require the combined forces of a mutual aid region or regions . . . ." (Gov. Code, § 8558, subd. (b).) The case before us deals with a "State of emergency" and one which deals specifically with an eradication program.

[10]Food and Agricultural Code section 5029 reads in part: "(a) The department, in consultation with the Office of Environmental Health Hazard Assessment, shall design and implement a program to provide information to persons who reside in areas scheduled to be treated with pesticides on an emergency basis in order to eradicate plant pests. [¶] (b) The purpose of this program is to provide information about the health effects of the pesticides used in eradication projects. The program shall be designed to provide the greatest amount of information practicable to affected citizens. The department shall conduct outreach efforts to inform the public about the existence of this program." (In 1991 the "Office of Environmental Health Hazard Assessment" was substituted for "the State Department of Health Services.") (Food & Agr. Code, § 5029, subd. (a), as amended by Governor's Reorganization Plan No. 1 of 1991, § 22, eff. July 17, 1991.)

The department shall conduct outreach efforts to inform the public about the existence of this program.' (Food & Agr. Code, § 5029, subd. (b).)" (*Macias v. State of California, supra*, 10 Cal.4th at p. 855.)

"Other statutes delineate in precise and detailed terms the nature of the 'outreach' efforts required of the State during an eradication project." (*Macias v. State of California, supra*, 10 Cal.4th at p. 855.) Before aerially applying a pesticide (or economic poison) to effect the eradication, Food and Agricultural Code sections 5771, 5773 and 5774 require the State to notify residents, physicians, and the local media.[11] Some notices must be hand delivered. (Food & Agr. Code, § 5774.) The State must act promptly in providing notice and must notify if the scheduled date of application is changed. (Food & Agr. Code, §§ 5772, 5775.) "The State's notices must be in both English and in any other language if over 5 percent of persons receiving the notice speak only that language. (Food & Agr. Code, § 5777.) [¶] The contents of the State's notice is also statutorily prescribed. (Food & Agr. Code, § 5776.) It must contain the 'date and approximate time' of all proposed pesticide applications, the 'type of economic poison' to be applied, any 'health and safety precautions that should be taken,' and the address and telephone numbers of 'public health personnel . . . familiar with the eradication program.' (*Ibid.*) In addition, the State is required to establish and operate telephone 'hot lines' to 'provide information to the public on health issues related to application of the economic poison.' (Food & Agr. Code, § 5778.)" (*Macias v. State of California, supra*, at p. 856.)[12]

The state and counties are immune from civil actions from the administration of the notice requirements designed for eradication programs if "the director or the commissioner utilizes his or her best efforts to comply with the requirements of the article." (Food & Agr. Code, § 5780.)

B. *Immunity*

1. *Immunity Under the Emergency Services Act*

The State contends it is immune from civil liability under the Emergency Services Act immunity provision, Government Code section 8655. This section reads: "The state or its political subdivisions shall not be liable for

---

[11]A "pesticide" means an economic poison. (Food & Agr. Code, §§ 11404, 12753.)

[12]Effective January 1, 1991, the Legislature strengthened the notice requirements by amending Food and Agricultural Code sections 5771, 5775 and 5777, and adding section 5774.5. Information was required to be dispensed through the local broadcast and print media, information was to be provided to the city and county in the affected areas and information was to be provided in many languages, not just English and Spanish. (Stats. 1990, ch. 1678, §§ 1-4, pp. 8028-8029.)

any claim based upon the exercise or performance, or the failure to exercise or perform, a *discretionary* function or duty on the part of a state or local agency or any employee of the state or its political subdivisions in carrying out the provisions of this chapter." (Italics added.)

A number of cases have addressed the immunity codified in Government Code section 8655 in connection with Medfly eradication programs. In *Farmers Ins. Exchange* v. *State of California, supra,* 175 Cal.App.3d 494, insurance companies sought recovery for payments made to their policy holders. The companies paid their insureds after malathion, the chemical mixture used by the State in the Medfly aerial spraying, damaged car surfaces. In discussing the negligence cause of action, *Farmers* addressed which governmental decisions are discretionary and thus covered under the immunity umbrella: "It is clear that the Governor's proclamation under express authority of Government Code section 8625, and the subsequent spraying of malathion were policy level decisions. This would be true as well with respect to the myriad decisions regarding the implementation of the program, such as the length of spraying, size of droplets, type of mixture, area to spray, etc. Since plaintiffs' claim is based directly upon these acts, section 8655 applies to provide the state with immunity from liability. The purpose of the statute is obvious. In those cases where the state must take the steps necessary to quell an emergency, it must be able to act with speed and confidence without fear of incurring tort liability. [Citation.] [¶] Plaintiffs take the position that the spraying of malathion was ministerial rather than discretionary conduct. A ministerial act takes place on the purely operational level rather than the policy making or planning level. [Citation.] We have no difficulty concluding as a matter of law that the acts complained of[, being negligent and careless in the formulation and spraying of the malathion mixture,] were an exercise or performance (i.e. carrying out) of a discretionary function on the part of the state. Thus the state has absolute immunity from liability for negligence under Government Code section 8655." (*Id.* at p. 505.)[13]

In *LaBadie* v. *State of California* (1989) 208 Cal.App.3d 1366 [256 Cal.Rptr. 604], the trial court sustained a demurrer on plaintiff's one cause of action against the State for negligent misrepresentation. Plaintiff alleged she left her home during the time malathion spraying was to occur. On return to her home, she telephoned the State's telephone information service and was informed the spraying in her area was completed. Notwithstanding these

---

[13]*Farmers Ins. Exchange* v. *State of California, supra,* 175 Cal.App.3d 494, also found the State was immune from the cause of action for strict liability caused by the use of malathion. *Farmers* resolved causes of action for inverse condemnation, trespass to chattels, nuisance, tortious interference with contractual relations and denial of civil rights on other grounds.

statements, the spraying continued and as a result, plaintiff suffered physical injuries. The appellate court concluded the State was immune under Government Code section 8655 because the alleged wrongful conduct was discretionary rather than ministerial. "Due to mechanical difficulties, the malathion spraying could not be completed in accordance with the original schedule. A decision had to be made whether to continue to spray. Whether there was time to fully inform the public or other state information services and whether to continue the spraying are policy level decisions. [T]he acts complained of . . . were in the exercise or performance of, or the failure to perform, a discretionary function and were part of the 'myriad decisions regarding the implementation of the program' [citation], for which there is governmental immunity pursuant to Government Code section 8655." (208 Cal.App.3d at p. 1369.)[14]

In *Macias* v. *State of California, supra,* 10 Cal.4th 844 the Supreme Court addressed the responsibility of manufacturers to warn the public after learning governmental entities were providing defective warnings during the Medfly eradication efforts.

*Macias* is instructive in resolving our issue, i.e., whether the State may be liable for intentional misrepresentation or intentional concealment of a known danger resulting in personal injuries. In *Macias*, a 14-year-old boy received injury to his eyes from malathion spraying by the State during an emergency Medfly program. The boy and his parents sued the State as well as the manufacturers of the malathion based upon a failure to warn. They alleged the health warnings actually given by the State were grossly inadequate, and differed markedly from product labeling approved by the Environmental Protection Agency (the EPA). The EPA warning followed the package labeling pointing to the dangers of malathion if allowed to contact the skin, eyes or if swallowed. In contrast, the warning flyers distributed by the State stated in relevant part: " 'No Health Hazard: [¶] Malathion is considered one of the safest insecticides in use today. . . .' " (10 Cal.4th at pp. 848-849). The trial court granted summary judgment in favor of the manufacturers and the plaintiffs appealed. The Court of Appeal reversed,

---

[14]*Teresi* v. *State of California* (1986) 180 Cal.App.3d 239 [225 Cal.Rptr. 517] addressed causes of action for inverse condemnation, negligence and intentional infliction of damage to personal property. In *Teresi*, a produce grower lost his pepper crop as a result of the Medfly eradication program. The inverse condemnation allegations, and negligence claims related thereto, were rejected because the State may take property when there is an urgency sufficiently important to override the policy of compensation. Other claims based on negligence were rejected because the state is immune for discretionary actions under Government Code sections 818.2, 820.2, 820.4. In a footnote, the appellate court stated the State would also be immune for its discretionary acts under Government Code section 8550 et seq. (180 Cal.App.3d at p. 244, fn. 3.)

finding the manufacturers had not discharged its duty to warn. When the matter was before the Supreme Court, the State was not a party to the appeal and plaintiffs' action against the State was still pending. (*Id.* at p. 852, fn. 7.)

The Supreme Court concluded the *private manufacturer* had no affirmative duty to warn the public about potential problems due to exposure to malathion spray. The Supreme Court emphasized that the Emergency Services Act, in conjunction with the Food and Agricultural Code designed and implemented to provide the public with certain information, made it clear the State had the responsibility of conveying the ". . . most complete and accurate health information practicable to the affected citizens. (Food & Agr. Code, § 5029, subd. (b).) It is probably no exaggeration to state that the program's ultimate success depended upon the public's complete trust and confidence in the medical information contained in the State's official findings and public pronouncements." (*Macias* v. *State of California, supra,* 10 Cal.4th at p. 859.) The eradication program would be compromised if the public received conflicting public and private health alerts. However, while the private manufacturer had no affirmative duty, "[w]e do not mean by this to suggest that the State may *withhold* critical information during an agricultural emergency to suppress public opposition. ■ On the contrary, the Food and Agricultural Code clearly requires full disclosure. (Food & Agr. Code, § 5029.)[15] [I]t is the *State's* responsibility to design and implement an informational protocol, and that responsibility, as we have seen, cannot as a practical and prudential matter be *divided* during an emergency. . . . [Thus,] the imposition of a private tort duty to warn or otherwise intervene in

---

[15]The State makes numerous arguments suggesting Food and Agricultural Code section 5029 has no relevancy to this case. (See fn. 10, *ante.*) Before summarily rejecting these arguments, we first note that plaintiffs are not seeking civil remedies based upon violations of this statute. Plaintiffs are not suggesting their cause of action is based solely upon specific Food and Agricultural Code notice requirements. Rather, plaintiffs suggest the notice scheme shows the Legislature's intent to command the State to provide accurate information. It is this intent which undercuts the State's suggestion it is immune from liability when it intentionally withholds information from its citizens about the toxic qualities of chemicals used in an eradication program.

Specifically, the State argues plaintiffs never pleaded directly or inferentially the applicability of Food and Agricultural Code section 5029. However, as relevant to this discussion, plaintiffs explicitly stated the State misrepresented the health risks of the chemicals they were handling. The State next argues this statute does not apply because Trimedlure is not a pesticide. However, this fact will have to be determined by a trier of fact. (Food & Agr. Code, §§ 11404, 12753 [defining "pesticide"]; Cal. Code Regs., tit. 3, § 6000 [same]; cf. 7 U.S.C. § 136(u).) The State next argues Food and Agricultural Code section 5029 applies to residents and not to its workers. However, this limited reading of the statute ignores its stated purpose to "provide information about the health effects of the pesticides in eradication projects. The program shall be designed to provide the greatest amount of information practicable to affected citizens." It would subvert the intent of the Legislature to suggest citizens with the most contact with chemicals used in eradication programs, such as plaintiffs, should not be provided with information because they were not "residents" in the area to be treated.

these circumstances could severely compromise the State's efforts . . . ." (*Id.* at pp. 859-860, original italics.)[16]

 Here, the State is trying to avoid its responsibility by suggesting Government Code section 8655 immunizes it for all acts, including intentional misrepresentations relating to health and safety, because such acts were discretionary. However, this approach fails to recognize the State's mandatory obligation to provide complete and accurate information and fails to recognize that the exercise of the State's police powers must be reasonable and proper under the circumstances. (*Farmers Ins. Exchange* v. *State of California, supra,* 175 Cal.App.3d at p. 501.)[17]

The Legislature authorized the Governor to declare an emergency under the Emergency Services Act. However, it also spelled out in the Food and Agricultural Code specific steps the State must take to notify its citizens of critical safety information during an eradication program. The Legislature provided wide authority to the Governor to declare an emergency by the Emergency Services Act, but also mandated through the Food and Agricultural Code attendant notification responsibilities if that emergency required an eradication program. Thus, while the State had the discretion to formulate the eradication program and had the discretion to carry out that function, the State had no discretion not to use its best efforts to accurately notify its citizens of health and safety precautions to be taken.

Food and Agricultural Code section 5780 specifically exonerates the State from civil actions when "best efforts" are used to comply with the notice requirements designed for eradication problems. Intentionally misrepresenting the toxic nature of a chemical used in the eradication program could not possibly be considered "best efforts" to comply with the strict notice requirements or to comply with the State's obligation to provide complete and accurate information relating to health and safety. Unlike *LaBadie* v. *State of California, supra,* 208 Cal.App.3d 1366, the allegations here are not that the State made negligent misrepresentations. The lawsuit before us does not involve a request for relief based upon minor violations of the notice provisions, such as a notification delivered a few hours late or to the wrong area or written in the wrong language. The State would be immune for

---

[16]Because the State was not a party to the appeal in *Macias* v. *State of California, supra,* 10 Cal.4th 844, the Supreme Court expressed no opinion on the claims against it. (*Id.* at pp. 860, 852, fn. 7.)

[17]Many cases discuss the difference between the State's power of eminent domain, for which there is compensation for a taking, and the proper or legitimate exercise of the State's police power, for which there is no compensation. (E.g., *Farmers Ins. Exchange* v. *State of California, supra,* 175 Cal.App.3d at pp. 501-502; *Freeman* v. *Contra Costa County Water Dist.* (1971) 18 Cal.App.3d 404, 408 [95 Cal.Rptr. 852].)

these type of errors as they would be an exercise or performance of a discretionary function. (*Farmers Ins. Exchange* v. *State of California, supra,* 175 Cal.App.3d at p. 505.) Rather, plaintiffs allege the State knew Trimed-lure could cause the symptoms being suffered by plaintiffs, specifically withheld the material safety sheets from plaintiffs which may have given plaintiffs that information, lied to plaintiffs when asked if the chemical was safe, rejected plaintiffs' pleas to wear protective clothing for fear of alarming the public and fired plaintiffs for discussing those fears and informing the media of their concerns. The error complained of in this case, if proved, is a purposeful attempt to subvert the State's responsibility to provide accurate information.

We recognize in a state of emergency it is imperative the State must be able to act with haste in exercising its sovereign powers to protect the public. (*Macias* v. *State of California, supra,* 10 Cal.4th at p. 856.) However, in exercising that power in situations in which the State is also obligated to provide accurate information to the public in the context of an eradication program, there can be no reason for the State to purposefully withhold health and safety information from persons most likely to be injured. The State cannot thwart plaintiffs' claims by labeling their actions as "discretionary acts" or acts which are but a "myriad of decisions regarding the implementation of the Medfly program." The statutes do not provide the State with any decisionmaking in this arena. The State is required to use its best efforts to provide accurate and complete health and safety information; no decisionmaking is required.[18] Thus, the Emergency Services Act does not immunize the State.

2. *Immunity Under the Government Codes*

The Government Codes discussing governmental tort liability supports our conclusion the State is not immune for an actual misrepresentation resulting in personal injury.

■ Under the Government Tort Claims Act, "governmental tort liability must be based on statute; all common law or judicially declared forms of tort

---

[18]In *Macias* v. *State of California, supra,* 10 Cal.4th 844, the Supreme Court was faced with a summary judgment motion. *Macias* stated that upon the facts presented in that case, the ". . . accuracy of the State's health warnings is clearly the subject of bitter dispute, [although] it is generally uncontested that the warning protocol designed and implemented by the Department of Food and Agriculture during the 1989-1990 Medfly eradication program conformed to the statutory requirements. . . ." (*Id.* at p. 857.) We remind our readers we render our ruling assuming the allegations made by plaintiffs are factually supportable and thus accept the factual assertion that the State purposefully hid important health and safety information from plaintiffs.

liability, except as may be required by state or federal Constitution, were abolished. ([Gov. Code,] § 815.)" (*Michael J.* v. *Los Angeles County Dept. of Adoptions* (1988) 201 Cal.App.3d 859, 866 [247 Cal.Rptr. 504].) "The policy underlying the [Tort Claims] Act is that liability is the rule, immunity the exception. [Citation.] 'Unless the Legislature has clearly provided for immunity, the important societal goal of compensating injured parties for damages caused by willful or negligent acts must prevail.' [Citation.]" (*Id.* at p. 867.)

██ Government Code section 818.8 provides an immunity to public entities for misrepresentations and section 822.2 provides an immunity for public employees for misrepresentations.[19] "The immunity provisions state that the immunity includes both 'negligent' and 'intentional' misrepresentations except that the public employee is not immune if 'he is guilty of actual fraud, corruption or actual malice.' ([Gov. Code,] § 822.2.) . . . The Government Code does not define 'misrepresentation[]'[; however,] courts have assumed that the immunity includes all types of fraud and deceit cases including fraudulent concealment. [Citations.]" (*Michael J.* v. *Los Angeles County Dept. of Adoptions, supra,* 201 Cal.App.3d at p. 867, fn. omitted.)

Immunity under Government Code sections 818.8 and 822.2 is not absolute. Rather, it applies only when the negligent or intentional wrongdoing involves interferences with financial or commercial interests. (*Garcia* v. *Superior Court* (1990) 50 Cal.3d 728, 738, fn. 8 [268 Cal.Rptr. 779, 789 P.2d 960]; *Johnson* v. *State of California* (1968) 69 Cal.2d 782, 800 [73 Cal.Rptr. 240, 447 P.2d 352] clarified on another point in *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]; *Michael J.* v. *Los Angeles County Dept. of Adoptions, supra,* 201 Cal.App.3d at p. 867.) It "does not apply to . . . misrepresentations involving a risk of physical harm." (*Garcia* v. *Superior Court, supra,* 50 Cal.3d at p. 738, fn. 8.)

Thus, for example, if a building inspector intentionally suppressed a fact that a residence did not meet various standards (*Harshbarger* v. *City of Colton* (1988) 197 Cal.App.3d 1335 [243 Cal.Rptr. 463]) or there was an erroneous notification that a business operation violated zoning ordinances (*Brown* v. *City of Los Angeles* (1968) 267 Cal.App.2d 849 [73 Cal.Rptr. 364]), the entities are immune as the misrepresentations invaded financial or commercial interests.

---

[19]Government Code section 818.8 provides: "A public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional."

Government Code section 822.2 provides: "A public employee acting in the scope of his employment is not liable for an injury caused by his misrepresentation, whether or not such misrepresentation be negligent or intentional, unless he is guilty of actual fraud, corruption or actual malice."

In contrast, when a governmental adoption services makes misrepresentations regarding the health of a potential adoptive baby (*Michael J.* v. *Los Angeles County Dept. of Adoptions, supra,* 201 Cal.App.3d 859), or a deputy sheriff makes a misrepresentation by placing a vodka bottle next to a car accident victim before a photograph of the scene is taken (*Bastian* v. *County of San Luis Obispo* (1988) 199 Cal.App.3d 520 [245 Cal.Rptr. 78]), the governmental entities are not immune. (Cf. *Garcia* v. *Superior Court, supra,* 50 Cal.3d at p. 738, fn. 8 [plaintiff may be able to state cause of action when parole officer knowing parolee is a danger to plaintiff's safety makes a misrepresentation].)

██ Here, the intentional misrepresentations were not related to a commercial or financial transaction. Rather, plaintiffs alleged they were personally injured due to the intentional concealment of health and safety information. When the Legislature enacted the Government Torts Claims Act it narrowly proscribed when a public entity could be responsible for misrepresentations. Under the Government Tort Claims Act, governmental entities such as the State would not be immunized for the misrepresentations alleged to have occurred here as they related to a risk of physical harm.

Because the immunity contained in the Emergency Services Act is broader than that contained in the Government Tort Claims Act (cf. *LaBadie* v. *State of California, supra,* 208 Cal.App.3d at p. 1369), the State is immune for negligent misrepresentations. (*Id.* at p. 1368.) However, when the misrepresentation is intentional and relates to physical safety, the State is not immune from liability.[20]

IV.*

GOVERNMENTAL CLAIMS

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

V.

DISCRIMINATION BASED UPON PHYSICAL HANDICAP

██ In addition to the facts delineated above, plaintiffs alleged, in their complaint or in their opening statement, that the State punished them for seeking medical attention for their ailments caused by the chemicals, first

---

[20]We have discussed the foundation of plaintiffs' allegations, not necessarily the technical label associated with each cause of action.

*See footnote, *ante,* page 1802.

through harassment and intimidation while plaintiffs were employees, and subsequently by terminating their employment. Based upon these allegations, plaintiffs asserted a cause of action for discrimination based upon physical handicap.

The State contends the cause of action for discrimination based upon a physical handicap is precluded because plaintiffs' exclusive remedy for this cause of action is workers' compensation. This contention is persuasive.

Government Code section 12940 makes it unlawful for an employer to discriminate against an employee for a number of things, including physical handicap.[25]

"Section 3600 of the Labor Code provides that an employer is liable for injuries to its employees arising out of and in the course of employment, and section 3601 declares that where the conditions of workers' compensation exist, the right to recover such compensation is the exclusive remedy against an employer for injury or death of an employee." (*Johns-Manville Products Corp.* v. *Superior Court* (1980) 27 Cal.3d 465, 467-468 [165 Cal.Rptr. 858, 612 P.2d 948, 9 A.L.R.4th 758], fn. omitted.) Thus, "[a]s a general rule, an employee injured in the course of employment is limited to the remedies available under the Workers' Compensation Act. [Citation.]" (*Davis* v. *Lockheed Corp.* (1993) 13 Cal.App.4th 519, 521 [17 Cal.Rptr.2d 233].)

A number of cases have addressed whether workers' compensation is the exclusive remedy for an employee discriminatorily terminated due to a physical handicap arising from a work related injury. All have held such claims are exclusively covered by workers' compensation. (*Langridge* v. *Oakland Unified School Dist.* (1994) 25 Cal.App.4th 664 [31 Cal.Rptr.2d 34]; *Angell* v. *Peterson Tractor, Inc.* (1994) 21 Cal.App.4th 981 [26 Cal.Rptr.2d 541];[26] *Usher* v. *American Airlines, Inc.* (1993) 20 Cal.App.4th

---

[25]Prior to the 1992 amendments, Government Code section 12940 read in part: "It shall be an unlawful employment practice . . . [¶] . . . [f]or an employer, because of race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, or sex of any person to refuse to hire . . . or to bar or to discharge the person from employment . . . ." (Stats. 1989, ch. 1309, § 3, pp. 5237-5238.) The 1992 amendment, throughout the section, substituted the words "physical disability, mental disability" for "physical handicap, medical condition." (Stats. 1992, ch. 912, § 5, ch. 913, § 23.1.)

[26]*Angell* v. *Peterson Tractor, Inc., supra,* 21 Cal.App.4th at pages 996-997, also concluded the injured employee's claim for wrongful termination in violation of public policy was included within the confines of workers' compensation and thus preempted. In *Angell,* the public policy violation was the discrimination based upon physical handicap, and thus was the same as the claim for termination based upon a physical injury.

1520 [25 Cal.Rptr.2d 335];[27] *Denney* v. *Universal City Studios, Inc.* (1992) 10 Cal.App.4th 1226 [13 Cal.Rptr.2d 170]; *Pickrel* v. *General Telephone Co.* (1988) 205 Cal.App.3d 1058 [252 Cal.Rptr. 878]; *Fortner* v. *Safeway Stores, Inc.* (1991) 229 Cal.App.3d 542 [280 Cal.Rptr. 409].)[28]

The rationale of these cases is as follows. Workers' compensation is based upon a "quid pro quo." The Legislature has balanced the benefits and burdens to employers and employees. Employees receive payment for injuries in the work place without having to prove fault and employers receive an exemption from civil suit. Workers' compensation is intended to include all claims for all risks reasonably encompassed within the compensation bargain. Tort claims are permitted when injuries occur while the employee performs services incidental to the employment and which are viewed as risks of employment. Labor Code section 132a provides for an increase in compensation to any employee discriminated against as a result of an injury incurred in the course and scope of employment.[29] Labor Code section 132a applies only to injured workers. Unlike other situations, such as when an employee is discriminated against in violation of the whistle-blower statutes (*Shoemaker* v. *Myers* (1990) 52 Cal.3d 1, 20-23 [276 Cal.Rptr. 303, 801 P.2d 1054]; *Southern Cal. Rapid Transit Dist.* v. *Superior Court* (1994) 30 Cal.App.4th 713 [36 Cal.Rptr.2d 665]), with the enactment of Labor Code section 132a the Legislature specifically intended claims of discrimination based upon physical injury to be included within the workers' compensation

[27]*Usher* v. *American Airlines, Inc., supra,* 20 Cal.App.4th at pages 1527-1528, also concluded the cause of action for breach of contract was barred by the exclusive provisions of workers' compensation because the essence of that cause of action was discrimination based upon industrial injury.

[28]After the facts giving rise to this case, the Legislature amended Government Code section 12993. *Cammack* v. *GTE California Inc.* (1996) 48 Cal.App.4th 207 [55 Cal.Rptr.2d 837] review granted November 26, 1996 (S056183) and *City of Moorpark* v. *Superior Court* (1996) 49 Cal.App.4th.973 [57 Cal.Rptr.2d 156] review granted November 26, 1996 (S057121) have reached contrary results as to the effect of these statutory changes on whether employees fired due to job-related disabilities may seek redress outside of workers' compensation. (See also *Gallo* v. *Board of Regents of University of California* (S.D.Cal. 1995) 916 F.Supp. 1005.) Since this amendment was not in effect when this action arose, we need not concern its applicability to plaintiffs' cause of action. (*Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.* (1947) 30 Cal.2d 388, 392 [182 P.2d 159].)

[29]Labor Code Section 132a reads in part: "It is the declared policy of this state that there should not be discrimination against workers who are injured in the course and scope of their employment. [¶] (1) Any employer who discharges, or threatens to discharge, or in any manner discriminates against any employee because he or she has filed or made known his or her intention to file a claim for compensation . . . is guilty of a misdemeanor and the employee's compensation shall be increased by one-half, but in no event more than ten thousand dollars ($10,000). . . . Any such employee shall also be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer. [¶] . . . [¶] (4) . . . [¶] Proceedings for increased compensation as provided in paragraph (1), or for reinstatement and reimbursement for lost wages and work benefits, are to be instituted by filing an appropriate petition with the appeals board. . . ."

scheme.[30] Thus, Labor Code section 132a is the only remedy for an employer's discriminatory actions against an employee based upon a work-related injury.

Plaintiffs may not proceed with their claim for discrimination based upon physical handicap. They must seek redress for any such purported wrong through workers' compensation.

## VI.

### FRAUDULENT CONCEALMENT*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment of nonsuit is reversed and the matter is remanded to the trial court. Costs are awarded to appellants.

Klein, P. J., and Croskey, J., concurred.

Respondents' petition for review by the Supreme Court was denied March 12, 1997.

---

[30]In addressing whistleblower statutes, the courts discuss the fact that the workers' compensation laws are broad, and the more narrowly drawn whistle-blowing statutes prevail. (*Shoemaker* v. *Myers, supra*, 52 Cal.3d at pp. 21-23.)

*See footnote, *ante*, page 1802.