[No. G017043. Fourth Dist., Div. Three. May 29, 1998.]

STEIN-BRIEF GROUP, INC., et al., Plaintiffs and Appellants, v.
HOME INDEMNITY COMPANY et al., Defendants and Respondents.

**COUNSEL**

Rutan & Tucker, Robert C. Braun, Duke F. Wahlquist and Ina Raileanu for Plaintiffs and Appellants.

Cooksey, Howard, Martin & Toolen, Philip M. Woog, Jon A. Hammerbeck, Engstrom, Lipscomb & Lack, Walter J. Lack, Brian J. Heffernan, Lynberg & Watkins, Dana A. Fox, Crosby, Heafey, Roach & May, James C. Martin, M. Reed Hunter and Anna S. Masters for Defendants and Respondents.

## OPINION

**WALLIN, J.**—Stein-Brief Group, Inc., the developer of two residential projects in south Orange County, sought a declaration that each of its various insurers wrongfully denied coverage and defense of several lawsuits brought against Stein-Brief by lot owners. Following motions *in limine*, during which Stein-Brief presented its "best case" factual scenario, the trial court ruled none of the insurers had any potential for coverage and consequently no duty to defend the underlying lawsuits. Stein-Brief appeals, contending the facts presented establish the insurers owed it a duty to defend in the actions identified below as the Koziol lawsuit and the Dickson lawsuit. We affirm.

### FACTUAL BACKGROUND

*The Koziol Lawsuit*

In April 1985, Donald and Lou Smallwood purchased lot 4 located in Monarch Beach Villas, a Stein-Brief residential development. At that time, lots 5 and 6 were the parking lot for the model homes and sales office of the Villas. Stein-Brief established an easement on lot 5 for the benefit of adjacent lot 4, and an easement on lot 5 for the benefit of adjacent lot 6. In 1987 lots 5 and 6 were purchased by Stuart Koziol, and a dispute arose between him and the Smallwoods over which house plan could be built on lot 5, the existence of the easement on lot 5 in favor of lot 4, and the placement of the property line wall between lots 4 and 5. This dispute was resolved in 1989 by a written settlement agreement between and among the Smallwoods, Stein-Brief and Koziol (the Smallwood settlement).

The Smallwood settlement provided, as relevant here, that Koziol could construct only a particular one-story house (the Andalusia plan) on lot 5 and a particular two-story house (the Soto Grande plan) on lot 6; Koziol agreed to accept payment from Stein-Brief in exchange for the disputed easement on lot 5 in favor of lot 4. Stein-Brief agreed to provide Koziol with construction plans for lots 5 and 6, which "shall have been approved by the County of Orange or any other governmental authority having jurisdiction thereof, and the Villas Homeowners Association, with all fees having been paid by [Stein-Brief]."

Koziol thought lot 5 was an "aesthetically better lot," but because it was limited to a one-story structure, he sold it to Terence and Cynthia Whitworth and decided to build a home for himself on lot 6. After the Whitworth escrow closed in June 1989, Koziol discovered the Whitworths' building plans for lot 5 provided for an easement across lot 6. Although Koziol had notice of the easement when he purchased the two lots, he believed his ownership of both lots had "expunged" it. Furthermore, the site plan attached to the Smallwood settlement did not show an easement on lot 6 in favor of lot 5; it showed placement of the house on lot 6 directly on the easement area. Koziol objected to the Whitworths' building plans, and a heated dispute arose between them.[1]

In the meantime, Stein-Brief hired an architect who prepared building plans for lot 6 and submitted them to the County of Orange for approval; the county returned the plans to the architect for some changes before a construction permit would issue. The architect, convinced that the plans would result in an encroachment on the claimed easement in favor of lot 5, refused to resubmit the plans to the county or to return them to Koziol until March 1990.

In June 1990, Koziol filed a complaint against Stein-Brief for breach of the Smallwood settlement, which he later dismissed without prejudice so the parties could arbitrate their disagreements. Before arbitration took place, however, Koziol and Stein-Brief engaged in settlement negotiations which Stein-Brief claimed resulted in an enforceable agreement. Koziol refused to honor the agreement, and Stein-Brief filed an action against him to enforce it. In March 1991, Koziol filed a cross-complaint against Stein-Brief based on the Smallwood settlement. He asserted breach of contract, bad faith denial of the existence of the contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and intentional and negligent infliction of emotional distress. The cross-complaint alleged Stein-Brief failed and refused to provide Koziol with plans for construction on lot 6; in reliance on Stein-Brief's representations that Koziol could not build anything other than the Andalusia model on lot 5, he sold lot 5 together with an easement over lot 6; Stein-Brief did not intend to enforce that restriction against the Whitworths; and Koziol had suffered humiliation, mental anguish, nervousness and insomnia as a result of the failure to provide the plans.

*The Dickson Lawsuit*

In 1988, M. Chris Dickson bought a lot in Ritz Cove, another Stein-Brief residential development. During construction of her home, she discovered

---

[1]Koziol sued the Whitworths over this issue and eventually prevailed.

there was an excessive amount of underground water on the lot. She eventually learned the cause was a defective drainage system. Dickson filed a complaint against Stein-Brief, alleging it breached its contract and warranty to her that the lot would be suitable for the construction of a single family residence; it intentionally or negligently induced her to buy the lot by representing there would be no problems with excessive groundwater; it negligently improved the lot; and the excessive groundwater caused her to suffer increased construction costs.

## The Insurers

The Home Insurance Company was Stein-Brief's primary insurer from January 1, 1988, to March 1, 1990; Scottsdale Insurance Company was its primary insurer from March 1, 1990, to March 1, 1991. National Union Fire Insurance Company of Pittsburgh, Pennsylvania underwrote its umbrella policy. All the policies were commercial general liability policies (CGL), providing, with substantially similar language, coverage for liability because of property damage (loss of use of tangible property which has not been physically injured or destroyed) or bodily injury (bodily injury, sickness or disease, including mental anguish and mental injury) arising out of an occurrence (an accident or event resulting in bodily injury or property damage neither expected nor intended from the standpoint of the insured). The Home and Scottsdale. also underwrote liability coverage for personal injury arising out of wrongful entry or eviction or other invasion of the right of private occupancy.[2]

## The Declaratory Relief Action

Stein-Brief tendered both the Dickson and Koziol lawsuits to the insurers; all refused to defend. In August 1992, Stein-Brief filed a declaratory relief action. At the evaluation conference, the trial court ordered Stein-Brief to file a pretrial motion *in limine* setting forth its "best case scenario" in favor of coverage. The parties subsequently stipulated to a briefing schedule that effectively set up the insurers' responses as cross-motions *in limine* in favor of no possibility of coverage. The trial court heard argument and found no potential for coverage.

---

[2]Claiming Stein-Brief misquoted its policy language, National Union moved to produce its policies as additional evidence on appeal. Stein-Brief objected because National Union's proffered exhibits to its motion contained no declaration pages showing they were the actual policies in force during the applicable time periods. Stein-Brief submitted its version of the policies with declaration pages, asserting they were the actual policies from which it had accurately quoted. We accept both parties' versions of the policies, as suggested by Stein-Brief, and note that the minor discrepancies between the various versions have no bearing on our decision.

## DISCUSSION

*Standard of review*

Although couched as cross-motions *in limine*, the unusual and unorthodox procedure employed by the trial court here does not fit that procedural definition. A motion *in limine* is prophylactic in nature, made to exclude evidence before it is offered, "to avoid the obviously futile attempt to 'unring the bell' in the event a motion to strike is granted in the proceedings before the jury." (*Hyatt* v. *Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 337 [145 Cal.Rptr. 47].) Here, the trial court ordered Stein-Brief to set forth the facts most favorable to its case, which the court would assume as true, and then entertained legal arguments from both sides on the question of coverage. This is more in the nature of a motion for nonsuit, or demurrer to the evidence.

■ A motion for nonsuit may be made after the plaintiff completes the presentation of his or her evidence or after the opening statement. (Code Civ. Proc., § 581c, subd. (a).) If the evidence to be presented would not support a verdict in plaintiff's favor, judgment for the defendant may be entered. (*John Norton Farms, Inc.* v. *Todagco* (1981) 124 Cal.App.3d 149, 160 [177 Cal.Rptr. 215] and cases cited therein.) "[A] motion for nonsuit 'is the modern equivalent of a *demurrer to the evidence*: it concedes the truth of the facts proved, but denies that they, as a matter of law, sustain the plaintiff's case. [Citations.]' " (*Gray* v. *Kircher* (1987) 193 Cal.App.3d 1069, 1071-1072 [236 Cal.Rptr. 891] original italics.)

Continuing the analogy of the procedure below to a nonsuit gives us guidance as to the standard of review to be applied on appeal. We " 'must accept all facts asserted in the opening statement [or here, asserted in the best case scenario] as true and must indulge every legitimate inference which may be drawn from those facts. [Citations.] A nonsuit at this early stage of the proceedings is disfavored. [Citation.] It can only be upheld on appeal if, after accepting all the asserted facts as true and indulging every legitimate inference in favor of plaintiff, it can be said those facts and inferences lead inexorably to the conclusion plaintiff cannot establish an essential element of its cause of action . . . .' " (*Adkins* v. *State of California* (1996) 50 Cal.App.4th 1802, 1809 [59 Cal.Rptr.2d 59]; accord, *Edwards* v. *Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 28 [61 Cal.Rptr.2d 518].) Accordingly, we accept Stein-Brief's best case scenario of the facts and apply them to the language of the various policies as a matter of law.

*Duty to Defend*

■ All the insurers agreed to indemnify Stein-Brief against sums it might become *legally obligated to pay as damages* because of bodily injury

or property damage caused by an occurrence or by personal injury arising out of wrongful entry or eviction, or other invasion of the right of private occupancy. Stein-Brief admits the italicized language has been interpreted in California as covering tort but not contract liability. (*Stanford Ranch, Inc.* v. *Maryland Cas. Co.* (E.D.Cal. 1995) 883 F.Supp. 493, 496; *Fragomeno* v. *Insurance Co. of the West* (1989) 207 Cal.App.3d 822 [255 Cal.Rptr. 111].) It argues, however, that there is a potential for coverage where the insured performs its contractual duties in a negligent or otherwise tortious manner. Stein-Brief is mistaken.

In *Stanford Ranch Inc.* v. *Maryland Cas. Co., supra,* 883 F.Supp. 493, the underlying lawsuits involved a developer of single-family homes and its contracts with three subdevelopers. The agreements unraveled because of complications caused by the presence of wetlands and underground pools on the properties and the developer's failure to obtain the necessary permits and regulatory approval. The subdevelopers sued the developer for breach of contract, fraud and negligent misrepresentation. Reviewing California law, the court explained, "[T]he issue is not whether a claim is framed in tort or in contract. The key question is whether the duty that gives rise to liability is independent of the contract or rests upon it. If liability stems from the contract, the policy will not cover any award even if some of the damages are based on tort claims arising from the contractual relationship." (*Id.* at p. 496; accord, *Wilmington Liquid Bulk Terminals, Inc.* v. *Somerset Marine Inc.* (1997) 53 Cal.App.4th 186 [61 Cal.Rptr.2d 727]; *Loyola Marymount University* v. *Hartford Accident & Indemnity Co.* (1990) 219 Cal.App.3d 1217 [271 Cal.Rptr. 528]; *Fragomeno* v. *Insurance Co. of the West, supra,* 207 Cal.App.3d 822; *Insurance Co. of the West* v. *Haralambos Beverage Co.* (1987) 195 Cal.App.3d 1308 [241 Cal.Rptr. 427] [overruled on other grounds by *Buss* v. *Superior Court* (1997) 16 Cal.4th 35, 50, fn. 12 [65 Cal.Rptr.2d 366, 939 P.2d 766]]; but see *American States Ins. Co.* v. *Canyon Creek* (N.D.Cal. 1991) 786 F.Supp. 821 [potential for coverage where invasion of right of private occupancy arose from breach of contract].)

Here, both Koziol and Dickson based their claims on contract. Koziol alleged Stein-Brief breached the Smallwood settlement agreement by failing to provide building plans for lot 6 in a timely manner and by misrepresenting its intent to enforce the building restriction on lot 5. Dickson alleged Stein-Brief breached its sales contract with her by failing to deliver a lot suitable for construction as represented. Without the contracts, Stein-Brief would have had no duty to either Koziol or Dickson.

Stein-Brief argues Koziol's allegations of humiliation, mental anguish, and emotional and physical distress (which included insomnia and tremors

requiring medication) give rise to at least the potential of coverage under the "bodily injury" provision of the policies, thus triggering a duty to defend. But this issue was definitively resolved in *Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1 [44 Cal.Rptr.2d 370, 900 P.2d 619].

*Waller* involved the question of coverage under a CGL policy for emotional and physical distress resulting from economic losses arising out of a shareholder power struggle. The underlying plaintiff alleged involuntary dissolution of the corporation, breaches of fiduciary, good faith and statutory duties, breach of contract, interference with prospective economic advantage, and intentional infliction of emotional distress against his fellow shareholders. The court characterized the underlying lawsuit as a business dispute and the alleged torts as business and contract transgressions, and held the acts complained of were not covered occurrences under the policy. Consequently, the emotional distress damages, having flowed from the noncovered acts, were not covered. "These [CGL] policies were never intended to cover emotional distress damages that flow from an uncovered 'occurrence,' and the parties could not reasonably have expected that coverage would be expanded merely because a claim of emotional or physical distress is alleged as a result of the *economic loss*. . . . All allegations in the [shareholder's] complaint were related to [his] asserted *economic loss* as a . . . shareholder, and . . . shareholder disputes are not covered by [the] policy." (11 Cal.4th at p. 23, first italics added; see also *American Internat. Bank* v. *Fidelity & Deposit Co.* (1996) 49 Cal.App.4th 1558 [57 Cal.Rptr.2d 567]; *Miller* v. *Western General Agency, Inc.* (1996) 41 Cal.App.4th 1144 [49 Cal.Rptr.2d 55]; *Ticor Title Ins. Co.* v. *Employers Ins. of Wausau* (1995) 40 Cal.App.4th 1699 [48 Cal.Rptr.2d 368].)

Stein-Brief argues both the Koziol and Dickson complaints contain allegations sufficient to show the potential for coverage under the property damage provisions of the policies. Koziol claimed loss of use of the easement area on lot 6 and loss of use of both lot 5 and 6 due to Stein-Brief's breaches of the Smallwood settlement. Dickson claimed loss of use of her lot due to construction delays caused by the oversaturation of the land.

Arguably, the alleged loss of use fits the policies' definition of property damage: "loss of use of tangible property which has not been physically injured or destroyed." But the property damage coverage is subject to the same analysis as bodily injury. Both must flow from a covered occurrence. "Occurrence" is defined as an accident or event resulting in bodily injury or property damage neither expected nor intended from the standpoint of the

insured.[3] This definition "focuses coverage on unexpected or accidental injuries that are fortuitous and not planned or intended. This concept of fortuity is basic to insurance law." (*Waller* v. *Truck Ins. Exchange, supra,* 11 Cal.4th at pp. 16-17, italics omitted.) As discussed above, nonaccidental acts arising out of a breach of contract do not constitute an "occurrence" within the meaning of a CGL policy.

Furthermore, the delays and increased costs in home construction alleged here resulted in purely economic damages. In *American Internat. Bank* v. *Fidelity & Deposit Co., supra,* 49 Cal.App.4th 1558, the court found a claim against a lender for failure to make a home loan outside the coverage of the personal injury provisions. "[T]heir inability to construct a dream home was not physical damage to the property, it was an inability to make '[a] valuable addition . . . intended to enhance [their property's] value . . . .' [Citation.] . . . [T]he inability to construct an improvement results in only economic loss. And 'strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property covered by a comprehensive general liability policy. [Citations.]' [Citation.]" (*Id.* at p. 1572.)

Stein-Brief argues both complaints present a potential for coverage under the provisions in the Home and Scottsdale policies providing coverage for personal injury arising out of wrongful entry or eviction or other invasion of the right of private occupancy.[4] Stein-Brief correctly points out personal injury coverage is not dependent on an occurrence, as is bodily injury and property damage coverage, but arises out of one or more offenses specified in the policy. (*General Accident Ins. Co.* v. *West American Ins. Co.* (1996) 42 Cal.App.4th 95, 103 [49 Cal.Rptr.2d 603].) But like bodily injury and property damage coverage, personal injury coverage is limited to tort damages, as discussed above. Thus, liability arising out of contractual duties is not contemplated by the CGL policy. (*Stanford Ranch, Inc.* v. *Maryland Cas. Co., supra,* 883 F.Supp. at p. 497.)

This court had occasion to address the applicability of CGL personal injury coverage in *General Accident Ins. Co.* v. *West American Ins. Co.,*

---

[3]The Home policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." National Union's policy defined "occurrence" as "an event, including continuous or repeated exposure to conditions, which result in Personal Injury or Property Damage during the policy period, neither expected nor intended from the standpoint of the Insured." Scottsdale's policy defined "occurrence" as "an accident, including continuous repeated exposure to conditions, which results in bodily injury or property damage neither expected or intended from the standpoint of the Insured."

[4]The Home's 1989 policy provides personal injury must arise out of "wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies." National Union did not underwrite personal injury coverage.

*supra*, 42 Cal.App.4th 95. There, the underlying plaintiff became involved in a dispute with his fellow shareholders in an insurance agency business. Based on facts remarkably similar to those in *Waller*,[5] he alleged wrongful termination, breach of good faith and fiduciary duties, interference with contractual relations and prospective advantage, and intentional infliction of emotional distress. He sought damages, the appointment of a receiver, and dissolution of the corporation. Pointing out that the "wrongful entry" language had been construed as applying to "*tort* claims arising out of the interference with an interest in real property" (*Id.* at p. 103, italics added), we nevertheless found a potential for coverage, and thus a duty to defend, based on the discomfited shareholder's claims that he was ousted and ejected from the business premises, which was leased in his name as an individual. (*Id.* at p. 105.) These allegations referred to a breach of duty separate from the business relationship among the parties. (See *Aim Insurance Co.* v. *Culcasi* (1991) 229 Cal.App.3d 209 [280 Cal.Rptr. 766]; *Tinseltown Video, Inc.* v. *Transportation Ins. Co.* (1998) 61 Cal.App.4th 184, 200 [71 Cal.Rptr.2d 371].)

Furthermore, neither Koziol nor Dickson was occupying their properties when the alleged transgressions occurred; both were in the preconstruction stage. "The term 'other invasion of the right of private occupancy' draws meaning and content from the preceding language: 'wrongful entry or eviction.' Such language connotes disruptions of the ability of a landowner to actually occupy his property, not mere injuries to property. [Citation.]" (*Titan Corp.* v. *Aetna Casualty & Surety Co.* (1994) 22 Cal.App.4th 457, 476 [27 Cal.Rptr.2d 476].)

Because neither the Koziol nor the Dickson complaints presented any potential for coverage under the policies, none of the insurers had a duty to defend. The trial court's judgment is affirmed. Respondents are entitled to costs on appeal.

Sills, P. J., and Crosby, J., concurred.

---

[5]*Waller* did not address "personal injury" coverage.